274 F.2d 179
 UNITED STATES of America, Appellee,
v.
Alfredo AVILES, Charles Barcellona, Jean Capece, Charles Di
Palermo, Joseph Di Palermo, Natale Evola, Vito Genovese,
Vincent Gigante, Daniel Lessa, Nicholas Lessa, Rocco Mazzie,
Carmine Polizzano, Ralph Polizzano, Benjamin Rodriquez, and
Salvatore Santora, Appellants.
 No. 355, Docket 25682.
 United States Court of Appeals Second Circuit.
 Argued Sept, 15, 1959.
Decided Jan. 12, 1960.
 
 Jerome J. Londin, Asst. U.S. Atty., Southern Dist. of New York, New York City (S. Hazard Gillespie, Jr., U.S. Atty., Herbert B. Greene, Mark F. Hughes, Jr., Robert Price and Robert E. Scher, Asst. U.S. Attys., New York City, on the brief), for appellee.
 Saul Roth, New York City, for appellant Alfredo Aviles.
 Roy L. Reardon, New York City, for appellant Charles Barcellona.
 Albert J. Krieger, New York City (Theodore Krieger, on the brief), for appellants Jean Capece, Joseph Di Palermo and Benjamin Rodriquez.
 Robert R. Kaufman, New York City (Rudolph Stand, New York City, on the brief), for appellant Charles Di Palermo.
 Maurice Edelbaum, New York City, for appellants Natale Evola and Vincent Gigante.
 Solomon A. Klein, Brooklyn, N.Y. (Wilfred L. Davis, New York City, on the brief), for appellant Vito Genovese.
 Abraham H. Brodsky, New York City, for appellants Deniel Lessa and Nicholas Lessa.
 Henry K. Chapman, New York City, for appellant Rocco Mazzie.
 David Schwartz, New York City, for appellant Carmine A. Polizzano.
 Allen S. Stim, New York City, for appellant Ralph Polizzano.
 Herbert S. Siegal, New York City (Osmond K. Fraenkel, New York City, on the brief), for appellant Salvatore Santora.
 Before LUMBARD, Chief Judge, and CLARK and MOORE, Circuit Judges.
 LUMBARD, Chief Judge.
 
 
 1
 Alfredo Aviles and fourteen co-defendants appeal their convictions for conspiracy to violate the narcotic laws, 21 U.S.C.A. 173, 174 and sentences of imprisonment ranging from 5 to 20 years[1] after a three months' jury trial in the Southern District of New York. The indictment named a total of 37 defendants and 14 other co-conspirators, but only 17 defendants stood trial on the charge of conspiracy to import and smuggle narcotic drugs into the United States, to receive, conceal, possess, buy and sell the drugs; to dilute, mix and adulterate the drugs prior to their distribution; and to distribute the drugs. Judge Bicks granted the motion of defendant Vento for judgment of acquittal at the end of the case, and the jury acquitted defendant Fiano.
 
 
 2
 A summary of the evidence shows that there was ample support for the jury's finding of one overall conspiracy to import, distribute, purchase and sell narcotics in violation of law.
 
 
 3
 The testimony of the principal government witness, Nelson Silva Cantellops, shows that he first joined the conspiracy in March, 1955 and continued serving it in various capacities until July 1, 1957 when he was arrested. His testimony and extensive cross-examination consumed nineteen days of the trial. The government also called defendants Peter Contes, Joseph Basile, and Salvatore Marino who testified that they participated in the sale and distribution of durgs with various appellants, defendants and co-conspirators. The following chronological summary of the evidence of the conspiracy is based on the testimony of Cantellops unless otherwise stated.
 
 
 4
 In March, 1955 Cantellops attended a meeting at Al's Luncheonette at 34 East 4th Street, New York, with Charles Barcellona, Ralph Polizzano, Carmine Polizzano, Joseph Di Palermo and Anthony Colonna. Cantellops agreed to transport narcotics to Las Vegas for $1000. At the airport bus, while Barcellona was talking to Cantellops, an unidentified man handed Cantellops a package which he took to Las Vegas. In Las Vegas Carmine Polizzano met him and introduced him to the defendant Fiano to whom he gave the package later that evening. For this delivery of narcotics Cantellops was paid $1000 by Barcellona.
 
 
 5
 In June, 1955 Cantellops made a trip to Florida to pick up a shipment of narcotics. Carmine Pollizzano gave him a bus ticket and money and he went to Miami where he met Carmine Polizzano and drove to Tampa. When the rendezvous in Tampa was unsuccessful, Cantellops and Carmine Polizzano drove to Key West where outside the La Concha Hotel an unidentified man took a suitcase out of his pushcart and placed it in the back seat of the automobile in which Cantellops was waiting. After driving to Miami Cantellops took the train and delivered the narcotics to Ralph Polizzano at the 'plant' at 36 East 4th Street, next to Al's Luncheonette, as Carmine Polizzano watched from across the street. For this trip Joseph Di Palermo and Carmine Polizzano paid Cantellops $600 and later he also received an ounce of heroin as a tip.
 
 
 6
 Cantellops' third trip in August, 1955, took him to Chicago. Carmine Polizzano instructed him about the trip and gave him a package of narcotics from the trunk of a car parked in front of Al's Luncheonette. Cantellops took a bus to Chicago and the day after his arrival met Carmine Polizzano at a bar on Division Street where he was introduced to a man who picked up the narcotics in the booth where Cantellops had placed them. Cantellops and Carmine Polizzano then drove back to New York and, at Joseph Di Palermo's direction, Carmine Polizzano paid Cantellops. Following the Chicago trip, in August and September, 1955, Cantellops distributed narcotics for Ralph Polizzano.
 
 
 7
 In October, 1955 Carmine Polizzano asked Cantellops to pick up narcotics in Miami. He told Cantellops that if narcotics were not available in Miami he might have to go to Havana to see certain people. Cantellops went to Miami and at the La Concha Hotel met Charles Di Palermo who introduced him to a man named 'Cuba.' The three men then drove to the La Concha Hotel in Key West and the next day, upon directions from 'Cuba' they picked up a suitcase of narcotics in 'Cuba's' hotel room and brought the narcotics to New York by train. Back in New York Cantellops delivered the narcotics to Ralph Polizzano at the basement entrance of Al's Luncheonette upon directions from Carmine Polizzano. For this trip Cantellops was paid $250 by Joseph Di Palermo and $350 by Carmine Polizzano, who also arranged for his assistant, John Russo, to give Cantellops an ounce of heroin as a tip.
 
 
 8
 In October, 1955, upon Carmine Polizzano's directions, Cantellops explored the policy banks in the Eldridge Street area on Manhattan's lower East Side to find out whether these banks might be used as a front for narcotics distributing plants. After Cantellops had explored the policy banks, Carmine Polizzano invited him to a meeting at Ralph Polizzano's apartment on East 4th Street. This meeting was attended by Ralph and Carmine Polizzano, Joseph Di Palermo, John Russo, John Ormento and Benjamin Levine. The group discussed taking over and operating policy banks as a cover for the distribution of narcotics. Cantellops reported that it would cost between $100,000 and $150,000 to purchase the banks in the Eldridge Street area. The group reached no final decision as it was stated that the matters would have to be discussed with 'The Right Man,' who, as Cantellops' testimony later developed, turned out to be appellant Vito Genovese. The meeting also discussed the possibility of importing narcotics through Puerto Rico because of turmoil on Cuba and recent misfortuness respecting two shipments by boat. Cantellops suggested the use of the Island of Vieques, off Puerto Rico, as a distributing point.
 
 
 9
 During the early part of 1956, at the request of Joseph Di Palermo and Carmine Polizzano, Rosario Colletti delivered narcotics to Cantellops who in turn delivered them to John Gonzalez, alias Guayamita, at Gonzalez's apartment at 793 Ninth Avenue, where they were diluted for resale. In June 1956 Cantellops took over Gonzalez' operations and Joseph Di Palermo and the two Polizzanos arranged for Ralph Polizzano to supply Cantellops with the narcotics necessary to expand this business in the Spanish speaking market. Cantellops called Ralph Polizzano when he needed drugs and he picked them up from Russo at Al's Luncheonette or nearby places. While picking up narcotics at the East 4th Street plant Cantellops saw Ralph Polizzano and Charles Di Palermo diluting narcotics. On two occasions during 1956 when Cantellops was in the East 4th Street neighborhood, he saw Vito Genovese talking to Carmine Polizzano and on one of these occasions when Cantellops approached, he was told by Carmine Polizzano 'never to interfere when he was talking to 'The Right Man." In the summer of 1956 Cantellops, at Ralph Polizzano's request, made other local deliveries of narcotics.
 
 
 10
 In July, 1956, Cantellops made his fifth out-of-town trip, this time to Cleveland at the behest of Ormento and Carmine Polizzano. Carmine Polizzano in troduced Cantellops to appellant Vincent Gigante who drove Cantellops to Lorain, Ohio. At Lorain, Cantellops took the narcotics from behind the spare tire in the automobile trunk and then took them by bus to Cleveland. In Cleveland he Charles Di Palermo and he delivered the narcotics to an unidentified woman in a taxicab. After Cantellops returned to New York Carmine Polizzano arranged for him to meet Ormento and in Mazzie's presence Ormento paid Cantellops for the trip.
 
 
 11
 In August, 1956, a sale by Colletti to a narcotic agent resulted in the arrest of Colletti and Russo and the latter was replaced by the defendant Salvatore Marino who thereafter handled narcotics deliveries for the Polizzanos, at the Squeeze-Inn Bar, the plant at 36 East 4th Street and Al's Luncheonette at 34 East 4th Street. Thereafter Marino made frequent deliveries of drugs to Cantellops.
 
 
 12
 In August, 1956, Cantellops made his third trip to Miami to pick up narcotics. Before the Miami trip there were discussions and meetings at which Ormento offered Cantellops $1,500, to pick up narcotics in Mexico. After Cantellops refused to do this, meetings were held with a man called 'Mexican,' Mazzie and Carmine Galante regarding the details of a trip to pick up drugs. Cantellops still refused to go to Mexico.
 
 
 13
 The following evening Cantellops went with Ormento, Mazzie, 'Mexican' and the appellant Natale Evola to a restaurant on East 86th Street. Here Ormento spoke to Genovese and reported back to Cantellops that 'The Right Man' wanted to take a look at Cantellops to see if he was all right.
 
 
 14
 After this Cantellops went to 'Mexican's' hotel room somewhere on West 85th Street and discussed the trip to Mexico with the appellant Salvatore Santora, Evola, Mazzie, Ormento and 'Mexican.' Cantellops persisted in his refusal to go to Mexico but suggested that he go to Miami instead. As the change in plan involved a delay, Ormento to gave Cantellops money to entertain 'Mexican' in New York City, which Cantellops did for the next three days. After this Cantellops drove with 'Mexican' to Miami. The day after their arrival 'Mexican' drove Cantellops to Pompano Beach, secured a suitcase in a motel, and gave it to Cantellops. Cantellops then returned to New York by train and later gave the bag to an unidentified man. For this trip Ormento and Mazzie later paid him $950. After this Cantellops made two deliveries of narcotics to Philadelphia. On the first occasion Cantellops delivered three or four pounds of narcotics to a lame man, with Mazzie watching the delivery from a distance. For this Ormento paid Cantellops $350 in the presence of Santora and Mazzie and told Cantellops that Santora would have another trip for him.
 
 
 15
 A few days later Carmine Polizzano arranged for Cantellops to meet with Ormento, Santora and Mazzie at which time Ormento asked him to deliver narcotics to Philadelphia for Santora. Cantellops was driven to Philadelphia and delivered the narcotics according to instructions. For the second Philadelphia trip Santora gave money to Ormento who gave it to Cantellops in the presence of Mazzie and Evola. In addition, Cantellops testified to making a Brooklyn delivery for the same group, for which he was paid by Ormento.
 
 
 16
 In August, 1956, defendant Contes ordered a large quantity of heroin from Nicholas Lessa and Cantellops delivered this to Contes at the request of Mazzie who paid Cantellops for the delivery. The testimony of Peter Contes tended to confirm these transactions.
 
 
 17
 A few days later Ormento and Mazzie twice sent narcotics to Daniel and Nicholas Lessa, using Cantellops as the messenger. Mazzie supervised the second delivery and Ormento paid Cantellops for both deliveries.
 
 
 18
 At the end of August, or early September 1956, Cantellops attended a meeting at Mazzie's home at 2332 Seymour Avenue in the Bronx where plans were made for extending the distribution of narcotics. Earlier in the evening Cantellops drove to a German restaurant on East 86th Street with Evola, Ormento, Galante and Andimo Pappadio. After Ormento made a telephone call, they all drove to the West Side Highway and met another car. Cantellops and Ormento entered the other car which was driven by appellant Gigante. Ormento introduced Cantellops to Genovese, who was sitting in the back seat, saying to Genovese 'This man is doing a good job for us. He is helping us and doing a good job for us.' Ormento told Cantellops 'This is the Right Man.' Genovese said to Cantellops that they 'were going to a meeting where territorial control was to be discussed,' that the people at the meeting were counting on Cantellops to help them and that Cantellops could earn some money by doing so. The two automobiles drove to Mazzie's home and everyone entered except Genovese and Gigante who stayed outside. Evola, Mazzie, Ormento, Pappadio, Galante and Cantellops discussed the distribution of narcotics in the Spanish market in the East Bronx by use of policy banks and sealing off the area to eliminate competing narcotics peddlers and policy banks so that they could control the narcotics traffic in this area. Evola and Pappadio thought that the plan would take a month or a month and a half to complete and the others agreed. After twenty or thirty minutes Genovese came in. He wanted to know 'what was the decision in the plan, what they had in mind.' When he was told about the discussion which had taken place, Genovese said that he needed this information because he wanted to know when to send his men into the area. Later, in the presence of Evola, Ormento, Pappadio and Galante, Cantellops was advised that he would be the contact man for the distribution of narcotics in this area. Cantellops later delivered narotics in this area at Ormento's request.
 
 
 19
 In September, 1956, Ormento and Galante sent Cantellops to Puerto Rico for narcotics. In Puerto Rico he contacted someone named Laurensano who instructed him where to find one Perez on the island of Vieques. When Cantellops met Perez he was given a double marine canvas bag containing narcotics. Cantellops advised Laurensano that he was sending the drugs to three fictitious persons in care of General Delivery, Post Office, New York, and Laurensano advised that he would inform Ormento. Cantellops then mailed the heroin in three packages from three separate post offices. When Cantellops returned to New York Carmine Polizzano arranged to have him meet Ormento who said the drugs had arrived and Ormento paid him for the trip.
 
 
 20
 After this Cantellops met with Joseph Di Palermo, 'Cuba' and a man named Montanez, and Montanez advised that there would be no more shipments from Cuba to Miami and Key West for the rest of the year because of unsettled conditions in Cuba. This meeting took place just a few days before Cantellops was arrested in September, 1956, and he remained in prison until February, 1957.
 
 
 21
 According to the testimony of three customs inspectors, Joseph Di Palermo, Jean Capece and Salvatore Benanti visited Cuba for two days in November, 1956, and returned to New York on November 20. Jean Capece was searched by a customs inspectress who found $9,000 in new one hundred dollar bills hidden in an undergarment. Jean Capece gave three different stories regarding this money.
 
 
 22
 When Cantellops left prison in February, 1957, he resumed his narcotics dealings with the Polizzanos, the Di Palermos and Ormento. The appellant Alfredo Aviles became a customer and Cantellops and Marino delivered narcotics to him, Cantellops making his deliveries about once or twice a week from the East 4th Street plant. Aviles paid Cantellops who turned the money over to Ralph Polizzano or Marino and received $100 for each delivery. On one occasion, when Joseph Di Palermo was present, Cantellops saw Ralph Polizzano hand to Jean Capece the proceeds of one of these sales to Aviles. Later Aviles bought directly from Ralph Polizzano and Cantellops received commissions on the sales. Aviles in turn resold the drugs which he had purchased from Cantellops and Ralph Polizzano. Marino testified for the government and generally confirmed Cantellops' story about the deliveries and the dealings with Aviles.
 
 
 23
 Cantellops' fourth and last trip to Miami took place in April, 1957. Joseph Di Palermo and Carmine Polizzano instructed Cantellops to meet Charles Di Palermo in Miami. Carmine Polizzano provided Cantellops with a bus ticket and money and in Miami he met Charles Di Palermo and 'Cuba' at the La Concha Hotel. The trio then drove to the La Concha Hotel in Key West. In Key West an unidentified man put luggage in the rear seat of their car and Cantellops and Cuba took this back to Miami in the bus. Here they met Charles Di Palermo and, after rearranging the luggage, Cantellops took the drugs back to New York on the train and delivered them to Carmine Polizzano at the plant on East 4th Street. Later Joseph Di Palermo and Carmine Polizzano paid him about $600 for the trip and he later was given a tip of an ounce of heroin by Marino on Carmine Polizzano's instructions.
 
 
 24
 At a meeting in May, 1957, in Ralph Polizzano's apartment, there was further talk about sealing up the Eldridge Street territory. Present were Ralph Polizzano, Joseph Di Palermo, Ormento, Cantellops and some friend of Bennie Levine. Cantellops was ordered to start buying up the Spanish policy banks and he attempted to arrange meetings between the owners of these banks and the Polizzanos. Meanwhile Cantellops continued to deliver narcotics for the Polizzanos from the East 4th Street plant until July 1, 1957 when he was arrested.
 
 
 25
 As we have pointed out, the government called numerous witnesses to corroborate directly and circumstantially the testimony of Cantellops. The three principal supporting accomplice witnesses were Marino, Contes and Joseph Basile, the latter being the same Joseph Basile who was a government witness in United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, 262. Marino testified to a delivery of drugs for Ralph Polizzano on July 5, 1957, and a few hours later the police seized the plant at 36 East 4th Street and found quantities of cocaine and heroin and materials used to dilute, package and distribute these drugs. Marino confirmed Cantellops' testimony about the plant at 36 East 4th Street and Al's Luncheonette as centers from which narcotics were distributed by various means. He testified that he delivered narcotics for Ralph Polizzano from the fall of 1956 until his arrest on July 5, 1957.
 
 
 26
 Peter Contes testified to narcotics transactions involving Daniel Lessa, Nicholas Lessa, Rocco Mazzie and John Ormento. Contes purchased heroin from Daniel Lessa some time later in 1955 or early in 1956 and paid him $900 in the presence of Mazzie and Ormento, after which Nicholas Lessa delivered the narcotics to him. After this Contes made further purchases from Nicholas Lessa in varying amounts up to $2,600. One of Contes' customers was his cousin, Charles Pappalardo, and several days after selling him heroin in April, 1956, both Pappalardo and Contes were arrested by federal agents who searched Contes' apartment at 318 West 49th Street and found heroin and paraphernalia for diluting and packaging narcotics.
 
 
 27
 Joseph Basile testified to narcotics dealings which began in August 1955 with the appellant Joseph Di Palermo whom he knew as 'Joe Beck.' Joseph Di Palermo offered to sell heroin for $8,000 a kilo and cocaine for $400 an ounce. Basile was arrested in November 1955 but jumped bail and went to Europe. When he came back in January of 1956, he ordered half a kilo of heroin and cocaine from Joseph Di Palermo for which he paid $2,000 upon delivery to him by Johnny DePietro, also known as 'Johnny The Bug' and the balance of $1,500 at a later date. Basile disposed of the narcotics to his customers. Basile ordered more heroin a few days later at which time Joseph Di Palermo told him that the 'goods' came from 'Big John' Ormento whom Basile knew. Basile paid Joseph Di Palermo $3,500 in advance for the narcotics which were delivered to him later by Benanti. On another occasion Basile met Joseph Di Palermo and Jean Capece by telephoning Jean Capece at a number which Joseph Di Palermo had given him. Basile ordered half a kilo of narcotics for which he paid $3,500. The narcotics were delivered to Basile in an automobile by 'Johnny The Bug' in the presence of Jean Capece and Joseph Di Palermo. Basile took the narcotics to Schenectady and sold it to his customers. He stayed in Schenectady until his arrest on November 10, 1956, but meanwhile he purchased narcotics about once a month from Joseph Di Palermo by telephoning Jean Capece and giving her a message for Joseph Di Palermo or arranging to talk with him. On one occasion when Basile purchased heroin from Joseph Di Palermo, the package was delivered to him by Charles Di Palermo whom he knew as 'Charlie Brody.' Basile took the half kilo of heroin to Schenectady and sold it to his customers. On some occasions Joseph Di Palermo delivered narcotics to Basile in New Jersey at the Garden State Diner near the exit of the Garden State Parkway on Route 17.
 
 
 28
 None of the appellants took the stand before the jury and they called no co-defendant or alleged co-conspirator to rebut directly the strong case of the government.[2]
 
 
 29
 As is shown by the above summary of the principal testimony in the trial record of over 6700 pages, there was abundant evidence that all of the appellants, except Rodriquez, were part of one conspiracy to import, sell and deliver narcotics. The principal conspirators according to the proof were Vito Genovese, John Ormento, Joseph Di Palermo, Natale Evola, Rocco Mazzie, Carmine Polizzano and Salvatore Santora, among others. Their sources of supply were from such people as James Laurensano, 'Montanez,' 'Cuba' and 'Mexican,' in Cuba, Mexico and Puerto Rico. According to Cantellops' testimony, he himself went to Puerto Rico and mailed narcotics from there. Of course many of the principal actors not only took part in the importation and transportation of the narcotics, but they had to do with the distribution and delivery of them through others of the appellants such as Jean Capece, Charles Di Palermo, Ralph Polizzano, Vincent Gigante and assistants such as Nelson Cantellops, Salvatore Benanti, John Russo and Salvatore Marino who delivered to Joseph Basile, Peter Contes and William Rovira. The appellant Ralph Polizzano was concerned actively with many of the deliveries and pickups and he seems to have been more or less in charge of the plant and the activities centering around 36 East 4th Street and Al's Luncheonette. Others of the appellants such as Rocco Mazzie and the Lessa brothers, Daniel and Nicholas, had to do with distributing the narcotics to various minor outlets, such as the witness Peter Contes. Others in the group of minor distributors were the appellants Charles Barcellona and Alfredo Aviles.
 
 
 30
 While the proof is most abundant against those who were active in handling and distributing the narcotics to and from the East 4th Street plant, such as the Polizzano brothers and the Di Palermo brothers, the proof is also sufficient against those who were concerned with the planning and the strategy of the conspiracy and the expansion of its business such as Vito Genovese and Natale Evola.
 
 
 31
 Although there is no proof that Vito Genovese ever himself handled narcotics or received any money, it is clear from what he said and from his presence at meetings of the conspirators and places where they met and congregated that he had a real interest and concern in the success of the conspiracy. We find upon all the evidence that there is ample proof of Genovese's participation in the conspiracy as one of its principal directing heads. That Genovese was called 'The Right Man' by those actively dealing with the distribution of the narcotics and that he acknowledged the name is not without significance in view of his interest and participation in furtherance of the conspiracy.
 
 
 32
 From all that we have thus far said it follows that there was abundant evidence to implicate appellants Vito Genovese, Joseph Di Palermo, Charles Di Palermo, Carmine Polizzano, Ralph Polizzano, Rocco Mazzie, Natale Evola and Jean Capece. The appellants Daniel and Nicholas Lessa, Charles Barcellona and Alfredo Aviles all purchased narcotics for resale from one or more of the central conspirators on numerous occasions. This was enough to make them participants in the conspiracy as it is clear that they knew the nature of the operation. Whether they knew its full extent and all of its activities and actors is immaterial. This leaves for further consideration the sufficiency of the evidence regarding the appellants Santora, Gigante and Rodriquez.
 
 
 33
 Ralph Santora was sufficiently implicated in the conspiracy by his attendance at several meetings as well as by his use of Cantellops to deliver narcotics to Philadelphia on two occasions, as mentioned above. It was not error for the court to deny the motion of Santora's counsel to strike out Cantellops' testimony about a meeting early in August 1956 in the 'Mexican's' hotel room which was attended by Santora, Ormento, Evola, Mazzie, 'Mexican' and Cantellops where they discussed a trip to Mexico by Cantellops to bring in narcotics. The trial judge excluded overt act 15 of the indictment[3] from the jury's consideration, apparently because the proof was at variance as to the location of 'Mexican's' hotel. Of course this did not require exclusion of the overt act and we do not understand on what theory the overt act was excluded, but in any event, the exclusion of overt act 15 did not render irrelevant and inadmissible the evidence relating to this meeting since the evidence was relevant to the conspiracy charge.
 
 
 34
 The court did submit to the jury 17 of the 28 overt acts alleged in the indictment. As there was ample evidence to warrant the jury in finding that one or more of these 17 overt acts was committed in pursuance of the conspiracy nothing turns on any failure of proof regarding overt act 15.
 
 
 35
 As to Vincent Gigante, we have already referred to his trip to Lorain, Ohio with Cantellops and narcotics for delivery in Cleveland. During the trip Gigante named a number of the alleged conspirators and asked whether Cantellops was acquainted with them. Cantellops complained to Gigante about the risks he was taking in dealing in narcotics. Upon arrival in Lorain, Gigante told Cantellops to get the 'stuff' from behind the spare tire and take a bus into Cleveland. The only other evidence relating to Gigante placed him as the driver of the car in which Genovese, Ormento, and Cantellops traveled to the meeting mentioned above at which territorial control was discussed. Gigante apparently took no part in the conversation during this drive and he did not enter the house where the meeting was held. Gigante's participation in this second incident appears to be only as a chauffeur. But his trip to Lorain with Cantellops and his knowledge that narcotics were secreted in the trunk are clear evidence of his participation in the conspiracy. His statements during the trip to Lorain would seem to constitute sufficient evidence of his knowledge of the scope of the conspiracy and of the fact that his activity was in furtherance of a larger venture.
 
 
 36
 As to the defendant Benjamin Rodriquez, we are of the opinion that there is insufficient evidence of his knowing participation in the conspiracy to have warranted submitting the case against him to the jury. Rodriquez strenuously urges that as to him the record contains evidence only of a single isolated purchase of narcotics from Cantellops, and that that evidence, without any additional showing that he knew of the conspiracy of which Cantellops was a member or intended to join in it, is inadequate to convict him. We agree with this contention.
 
 
 37
 On direct examination, Cantellops testified that in the middle of September, 1955 he delivered narcotics to Rodriquez near the Progresso Bar in the Bronx. Rodriquez pointed out the person to whom Cantellops was to make the delivery and when they walked past each other he delivered the narcotics. When Cantellops gave testimony again about Rodriquez four days later, he testified about a delivery of drugs to Rodriquez's runner which he places as occurring in the spring of 1956. The only other evidence against Rodriquez was the testimony of a Treasury Agent that, when Rodriquez was arrested in his home on June 4, 1958, he found three cans of milk sugar and upon analysis one of these cans contained some quinine.
 
 
 38
 Upon cross examination Cantellops affirmed testimony given by him before the grand jury to the effect taht he first delivered narcotics to Rodriquez in the spring of 1956. Cantellops' statement on this point was definite and thus it seems to repudiate his prior direct testimony regarding a September, 1955 delivery. Moreover, his testimony contained no clear statement that there was more than a single delivery to Rodriquez, and no suggestion of any conversation with Rodriquez or other manifestation to him by Cantellops which might have given Rodriquez knowledge as to how Cantellops obtained the narcotics.
 
 
 39
 A single act may be the foundation for drawing the actor within the ambit of a conspiracy. See, e.g., United States v. Carminati, 2 Cir., 247 F.2d 640, certiorari denied, 1957, 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113. But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may reasonably infer from it such an intent. Thus, when two men join together to commit a single robbery, one may infer from their common participation in the robbery that they have conspired to commit the robbery. However, in a multiparty conspiracy of the sort revealed in the present case, with actors performing many different tasks in many places, the inference does not necessarily follow from one contact with one member of the conspiracy.
 
 
 40
 Rodriquez was not a regular customfr of Cantellops, so far as appears from the evidence. We may assume that Rodriquez knew that the narcotics were illegally imported, but there is insufficient basis in the evidence for assuming that he knew that Cantellops was an agent for an existing conspiracy. So far as appears, Rodriquez had no knowledge whatever as to how Cantellops came into possession of the drugs.
 
 
 41
 The single purchase alone was not enough to prove that Rodriquez was a participant in the conspiracy. It was necessary to the government's case to submit evidence that Rodriquez knew of the conspiracy and associated himself with it. United States v. Reina, 2 Cir., 242 F.2d 302, certiorari denied, 1957, 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427; United States v. Koch, 2 Cir., 1940, 113 F.2d 982; United States v. Peoni, 2 Cir., 1938, 100 F.2d 401. From evidence of knowledge of the conspiracy and a transaction with one of its members it would be reasonable to infer intent to participate in it, but there was no such evidence of knowledge here. Nor was there evidence of a continuous course of dealing between Rodriquez and Cantellops, which might warrant the inference that Rodriquez had some knowledge of the character of the source from which his narcotics came.
 
 
 42
 We therefore reverse the conviction of Rodriquez and direct the dismissal of the indictment against him.
 
 
 43
 We now proceed to the consideration of the appellants' numerous claims of error regarding the admission of evidence and the conduct of the trial and rulings of the trial judge.
 
 
 44
 Cantellops' Prior Perjury and Its Effect on His Trial Testimony
 
 
 45
 Most of the appellants lay great stress on the character of the witness Cantellops and his admitted perjury before the Grand Jury. They argue that his testimony should have been stricken, that no defendant may be convicted on Cantellops' uncorroborated testimony, and that the indictment should have been dismissed. We do not agree. It was for the jury to judge the witness Cantellops on the basis of all that was brought out about his character, his previous activities, his statements to the government, his testimony before the Grand Jury and before the petit jury.
 
 
 46
 The jury was fully advised of how Cantellops told his story to government agents and the United States Attorney, of his several appearances before the Grand Jury and the changes and modifications in his testimony there. Cantellops testified for five days on direct examination and for fourteen days on cross-examination. The report of his testimony covers about 2,000 pages of the stenographic minutes. The government made available to defense counsel Cantellops' Grand Jury testimony of 312 pages, two question and answer statements, dated October 10, 1957 and January 16, 1958, records showing Cantellops' visits to the United States Court House, the Veterans Administration's medical records regarding Cantellops, and Rikers Island medical records when the witness was there incarcerated in 1950 and 1953.
 
 
 47
 The fact that a witness testified untruthfully at a prior time does not require a finding that he is testifying perjuriously at trial. United States v. Margolis, 3 Cir., 1943, 138 F.2d 1002, 1004. It is for the jury to say whether his testimony at trial is truthful, in whole or in part, in the light of the witness' demeanor, his explanations and all the evidence in the case. United States v. Reina, 2 Cir., 242 F.2d 302, 307, certiorari denied 1957, 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427; United States Lennon, 2 Cir., 246 F.2d 24, 28, certiorari denied 1957, 355 U.S. 836, 78 S.Ct. 60, 2 L.Ed.2d 48.
 
 
 48
 Nor is there any merit in the contention that Cantellops' admissions that some of his testimony before the grand jury was untruthful vitiated the indictment. The Supreme Court has held that an indictment is not subject to challenge by reason of the incompetence of evidence presented to the Grand Jury. 'An indictment returned by a legally constituted and unbiased grand jury, like and information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits.' See Costello v. United States, 1956, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397.
 
 
 49
 The further claim is made that the convictions should be reversed because it now appears that Cantellops testified falsely at the trial that no promises had been made to him in return for his testimony. In this connection, affidavits have been filed on this appeal pointing out that on July 1, 1959, three months after the conviction in this case, the Governor of New York commuted Cantellops' sentence for possession of narcotics. This commutation was granted at the request of the United States Attorney because of Cantellops' assistance to the government in narcotics prosecutions. It does not follow from the action of the United States Attorney and the action of the Governor that any promise was made to the witness. It is a well understood practice for the prosecutor and the chief executive concerned to give appropriate consideration to witnesses who have assisted the government. The witnesses concerned are aware that this is so; the jurors and the general public are also aware of this practice. The purpose of the government is to encourage witnesses to tell what they know; that may be accomplished without prior promise in a particular case. Consequently we do not conclude from the fact of the Governor's commutation that Cantellops was testifying falsely when he disclaimed any promise. Surely it could have been no surprise to anyone that the witness was later shown some consideration; the jury knew that Cantellops hoped for such a result and that the jury gave this due weight can hardly be doubted in the light of the cross-examination on this subject and the arguments made by defense counsel in their summations.
 
 
 50
 The Interruption of Cantellops' Cross-Examination
 
 
 51
 The appellants complain that the trial judge erroneously interfered with their cross-examination of Cantellops because the judge permitted the witness to speak to his young daughter at the end of one day and to speak to court-assigned counsel during recess on the following day. These rulings were well within the proper discretion of the trial judge. There was no showing that these talks had to do with the substance of the witness' testimony and the argument that they unduly interfered with the right to cross-examine, or were in any way prejudicial, has no substance whatever.
 
 
 52
 On February 10, in the midst of a four weeks cross-examination which began January 30, Cantellops was shown a letter he had written his daughter in which he said he 'intended' to be released from prison around Christmas 1958. Later that day the court was informed that Cantellops, fearing for his daughter's safety, wished to see her. Cantellops thereafter talked to his daughter on the telephone although he did not see her. Certainly, under these circumstances and in light of the exceptional length of cross-examination, it was well within the trial court's discretion to release Cantellops from sequestration to speak with his daughter. See Kaufman v. United States, 6 Cir., 1947, 163 F.2d 404, 408.
 
 
 53
 The next day, following assertion by Cantellops that he was worried about his constitutional rights, the judge assigned Arnold Fraiman, Esq. as counsel and Cantellops conferred with him during recess the following day and advised him to answer certain questions which had been asked him. This course of procedure was entirely proper. No delay was involved, and the witness in fact answered all the questions asked him. The complaint of undue interference with cross-examination is frivolous. Indeed the court was exceedingly generous in the latitude it gave counsel in cross-examining Cantellops, even to the point of permitting considerable repetition and minute inquiry into many matters of doubtful relevance.
 
 
 54
 The Testimony of Ralph Polizzano's Admissions
 
 
 55
 Ralph Polizzano complains that the court should have granted him a mistrial because of the introduction of the testimony of James H. Gibbon, of the New York City Police Narcotics Squad, regarding admissions made by Polizzano to Gibbon. After hearing evidence, not in the jury's presence, the court rejected the claim that the admissions had been coerced.
 
 
 56
 Gibbon testified that after he arrested Ralph Polizzano on July 6, 1957, he went with Polizzano to his apartment #2 on the ground floor of 36 East 4th Street and that the latter told him the 'junk' was on top of the cabinet in a black zipper case, and that the cutting apparatus and scales were in another room.
 
 
 57
 Salvatore Marino then testified to making a delivery of narcotics from the apartment at 36 East 4th Street for Ralph Polizzano before his arrest the night of July 5. On cross-examination Marino claimed that in the police station he was punched in the stomach by the arresting officer and two other officers for five or ten minutes and was knocked out. He claimed he saw two or three other officers strike Ralph Polizzano in the stomach.
 
 
 58
 Not until this point in the trial did counsel for Ralph Polizzano move to exclude Gibbon's testimony of the oral admissions on the ground they were made under duress. Counsel asked for a hearing and for a mistrial if the court should find for Ralph Polizzano on these questions.
 
 
 59
 The trial judge could have denied the motions on the ground that they were untimely made. As it was, he granted a hearing at which Polizzano testified. From the discrepancies in the testimony of Marino and Polizzano, Polizzano's failure to complain earlier, his plea of guilty to a state narcotics charge based on the same facts, and the police medical records, there was ample reason for the judge to deny the motions as he did. Nevertheless he charged the jury that they were to disregard the admissions if they found them to have been made for fear of bodily harm, and that, in any event, they were to be considered solely against Ralph Polizzano. We find no error in these rulings.
 
 
 60
 Aviles' Postarrest Statement Regarding Ralph Polizzano
 
 
 61
 Ralph Polizzano also complains of the admission in evidence, over his objection, of an unsigned statement of appellant Aviles made after the latter's arrest on June 3, 1958. In this statement Aviles referred to a meeting with 'Ralph' at the Squeeze-Inn Bar, related that Ralph wanted him to buy stuff directly from him instead of teh Spanish fellow who had introduced him and stated that the stuff he bought from Ralph was delivered by a man he called 'Junior.' When the judge overruled the objection to admission of the exhibit, Ralph Polizzano's counsel sought to have the name 'Ralph' deleted or to have 'a man' substituted, but this application was also denied. The judge did instruct the jury three times immediately preceding and following admission of the statement that it was to be considered only against Aviles and repeated this admonition twice in instructing the jury. We find no error in the admission of the statement in evidence in view of the judge's careful and repeated instructions.
 
 
 62
 The government may introduce admissions of one defendant even though other defendants on trial are implicated, provided the jury is carefully and clearly instructed that the admission can be considered only against the declarant. Delli Paoli v. United States, 1957, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; United States v. Bando, 2 Cir., 244 F.2d 833, 838-839, certiorari denied 1957, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53. While it might have been the better practice under these circumstances to have deleted the name 'Ralph' from the statement before admitting it in evidence, so as not to run the risk of unnecessarily focusing attention on Polizzano, we see no reason to presume that the jury disregarded the judge's repeated instructions as to the use to be made of the admissions.[4]
 
 Barcellona's Right to Counsel
 
 63
 Appellant Barcellona complains that he was denied counsel in violation of his right under the Sixth Amendment which guarantees that 'In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence,' and under Rule 44, Federal Rules of Criminal Procedure, 18 U.S.C.A. We think appellant was adequately represented. It is true that Barcellona was without counsel from the time he appeared in the district court on July 16, 1958 until November 25, 1958, when the court assigned Roy Reardon, Esq. to represent him. But the trial did not commence until January 5, 1959 and thus his counsel had six weeks in which to prepare. This was ample assistance of counsel in view of the fa ct that Barcellona does not advise us in what respect he was prejudiced by his lack of counsel prior to November 25, 1959. Furthermore, he was given the benefit of all motions made by other counsel during pre-trial. So far as appears, all was done that needed to be done and could be done on his behalf. While there is language in the cases that an accused is entitled to counsel 'for any part of the pretrial proceedings' this is always coupled with the qualification that there is no error unless 'he is so prejudiced (by the absence of counsel) as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice." Crooker v. State of California, 1958, 357 U.S. 433, 439, 78 S.Ct. 1287, 1292, 2 L.Ed.2d 1448.
 
 Defendant Fiano's Courtroom Outburst
 
 64
 On March 11, when the government was adducing evidence as to defendant Fiano's birthday, Fiano burst into a tirade before the jury in which he asserted that all those on trial were convicts and that some were then serving time in prison. All defense counsel immediately moved for a mistrial. In the course of these motions counsel for Jean Capece asserted that his defendant had no criminal record, which led to further motions for a mistrial. The appellants claim that the Fiano outburst was provoked by the government, but there is no warrant for this assertion. In the context of the questioning then in progress, Fiano's birthday was a relevant line of inquiry. Following the outburst, Judge Bicks promptly instructed the jury to disregard Fiano's statements, and also told the jury that they were not to assume from the remarks of Capece's counsel that any other defendants had a criminal record. Manifestly it was not error to deny the mistrial motions. If such conduct by a co-defendant on trial were held to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so. Under all the circumstances the trial judge's instructions adequately dealt with the situation and his denial of the mistrial motions was proper. See, e.g., United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, 269; Reistroffer v. United States, 8 Cir., 1958, 258 F.2d 379, 392-393, certiorari denied 1959, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301.
 
 
 65
 Double Jeopardy Claims of Daniel and Nicholas Lessa and Joseph Di Palermo
 
 
 66
 Appellants Daniel and Nicholas Lessa claim that the trial court should have granted their motions for acquittal on the ground that they were twice placed in jeopardy because they had already been convicted for the same acts in United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256. In that case the evidence showed that the Lessas received their supply from Vellucci, through runners Ewing and Tedesco, until Vellucci was arrested in November 1955. It was only after that that they turned to the defendant Ormento for their supply. Thus the Lessas, as dealers, simply purchased their narcotics supplies from two different and separate groups. The mere fact that several retailers purchase from separate suppliers at different times does not transform two separate conspiracies into one.
 
 
 67
 Analysis of the Stromberg record and comparison with the proof in this case shows that the two conspiracies were entirely different enterprises in all respects, their principals, the source of their drugs, the means and places of importation, their distribution points, and the centers from which they operated in Manhattan.
 
 
 68
 Joseph Di Palmero, also indicted in the Stromberg conspiracy, likewise claims double jeopardy. As he was not placed on trial in Stromberg since he was then a fugitive, he has obviously not twice been placed in jeopardy.[5]
 
 The Simultaneous Trial of 17 Defendants
 
 69
 The complaint that the individual defendants could not receive sufficient individual consideration at a trial of 17 defendants is without basis in fact or law. The question of how many co-defendants shojld be tried at one trial is within the discretion of the trial court and there is no support for the claim that that discretion was abused here. The rights of each defendant were scrupulously guarded by the trial judge throughout the trial. In the number of extra challenges allowed in the jury selection, the latitude of cross-examination, the one week allowed for defense summations, and the patience shown in listening to numerous motions of the many counsel, the trial judge was eminently fair to the point of being overgenerous. Moreover, the court's charge to the jury fairly summarized the evidence, distinguished the case of each defendant and emphasized the requirement of separate consideration of the case as to each defendant. Under these circumstances, there can be no complaint of prejudice from such a joint trial. See United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, 265; United States v. Bruno, 2 Cir., 105 F.2d 921, reversed on other grounds, 1939, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257.
 
 Rulings on Evidence
 
 70
 Appellant Genovese complains he was so prejudiced by testimony that he was seen emerging from an automobile on January 17, 1956 at Kenmare and Mulberry Streets in Manhattan as to have necessitated the granting of a mistrial as to him. This testimony was given by Sherman Willse, a member of the staff of the Senate Select Committee on Improper Activities, who in January 1956 was a New York City police officer. This testimony was stricken by the court[6] with clear instructions to the jury to disregard it, although the government stated that it was prepared to show that the automobile was at the time registered in the name of appellant Vincent Gigante.
 
 
 71
 We cannot see how Genovese was improperly prejudiced by this testimony. We have read it over and conclude that it was utterly meaningless by itself and devoid of the sinister import which appellants seek to attach to it. In any event the striking of the testimony and the court's instruction to the jury cured any possible error in admitting it. Our jury system is founded on the assumption that the jury will adhere to the trial court's instructions to it. See United States v. On Lee, 2 Cir., 1951, 193 F.2d 306, affirmed 1952, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270. Under the circumstances here present, there is no reason to presume that the jury disregarded the court's instruction.
 
 
 72
 Appellant Jean Capece complains of the admission of testimony of a customs official that she flew to Cuba on November 20, 1956 with Joseph Di Palermo and Salvatore Benanti and upon her return two days later she had $9,000 in cash concealed in her brassiere. Coming after much evidence showing that Jean Capece worked with Joseph Di Palermo in the distribution of narcotics, that Benanti was a runner for Di Palermo, and that two months earlier, in September 1956, Montanez had advised Di Palermo that no narcotics would be available from Cuba for some time because of the revolution, this testimony was relevant to corroborate Cantellops' story. Moreover, Benanti's use of a false name and address and Jean Capece's three different versions of how she came to possess $9,000 in one hundred dollar bills would hardly support the theory that the two day trip by air was for a vacation. On the contrary, the trip was persuasive independent evidence corroborating Cantellops' testimony, as it was reasonable to conclude that the three had gone to Cuba to purchase narcotics, although apparently with some lack of success.
 
 
 73
 We have dealt with the major claims of error advanced by the appellants. The other contentions have so little merit that they do not warrant any discussion. to inspect a statement taken by the to inspect a statement from Customs United States Attorney from Customs Agent Benjamin Begendorf, for two reports of Narcotic Agent John Enright, and to take depositions of Begendorf and Enright were without the slightest foundation. Neither was called as a government witness and both were available to be called by the defense, who failed to call either. These motions seem to have had no purpose but to delay the trial. The trial judge exhibited commendable patience and courtesy in the face of such maneuvers.
 
 
 74
 On this appeal two of the defendants have been represented by assigned counsel, Roy L. Reardon for Charles Barcellona and Allen Stim for Ralph Polizzano. These counsel represented the same defendants at trial; in addition Martin Carmichael, Jr. represented Louis Fiano at trial. We commend them for their services so rendered and the high quality of their counsel.
 
 
 75
 With the exception of Rodriquez, the appellants have all been convicted after an eminently fair trial upon the convincing evidence of several accomplices which evidence was corroborated in important details.
 
 
 76
 We affirm the judgments of conviction of all appellants, except Benjamin Rodriquez and we reverse his conviction and direct that the indictment be dismissed as to him.
 
 
 
 [1]
 Charles Barcellona and Jean Capece received five year sentences; Vincent Gigante and Ralph Polizzano received seven years; Carmine Polizzano-- eight years; Alfredo Aviles, Natale Evola and Benjamin Rodriquez-- ten years; Charles Di Palermo, Nicholas Lessa and Rocco Mazzie-- twelve years; Deniel Lessa-- fourteen years; Joseph Di Palermo and Vito Genovese-- fifteen years; and Salvatore Santora-- twenty years. In addition, fines of $20,000 each were levied on Joseph Di Palermo, Natale Evola and Vito Genovese
 
 
 [2]
 Only five of the appellants called any witnesses, namely Carmine Polizzano, Mazzie, Gigante, Evola and Rodriquez. These witnesses testified principally regarding Carmine Polizzano's employment, Mazzie's home at Seymour Avenue in the Bronx, Cantellops and his visits to his family, and the Philadelphia neighborhood where Cantellops testified to making a delivery of drugs
 
 
 [3]
 '15. Further in pursuance of the said conspiracy and to effect the objects thereof, in or about the month of July 1956, in the Southern District of New York, the defendants John Ormento, Rocco Mazzie, Natale Evola, Salvatore Santora and co-conspirator Robert Roe had a conversation in a hotel on 85th Street, New York City, New York.'
 
 
 [4]
 We do not overlook the fact that when the jury asked for the Aviles statement during its deliberations the trial judge directed the deletion of 'Ralph' before sending the exhibit to the jury
 
 
 [5]
 The Stromberg proof showed that Joseph Di Palermo's only link with the conspiracy was Vellucci from whom he purchased heroin; he had no contacts with any of the principal Stromberg conspirators and he never had any contact with the Lessas so far as the proof in that case showed
 
 
 [6]
 In our opinion the court erred in excluding the evidence which corroborated Cantellops' testimony of the relationship between Genovese and Gigante as it tended to show tht Genovese was driven around by Gigante and it was near enough in time to the events in question