UNITED STATES of America,
Appellee,

v.

Wilson TORRES, Appellant.

No. 1238, Docket 74–1698.

United States Court of Appeals,
Second Circuit.

Argued Aug. 15, 1974.

Decided Oct. 8, 1974.

**1122**

Gary P. Naftalis, New York City, for appellant.

David A. Cutner, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the S. D. of N. Y.; John D. Gordan III, Asst. U. S. Atty. of counsel), for appellee.

Before OAKES, Circuit Judge, FRANKEL and KELLEHER, District Judges.*

OAKES, Circuit Judge:

This appeal is from a heroin-distribution conspiracy conviction, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 846.[1] Appellant principally claims that the evidence was insufficient because his involvement was demonstrated only as to a "single act," and that his trial was unfair in that the Government was improperly permitted to impeach a witness with his own prior inconsistent statement and by using an assistant United States attorney as a witness, an error which was compounded in the prosecutor's summation. While we disagree on the sufficiency question, we agree that there was reversible error as to the impeachment of the witness, Ortiz. The opinion will also refer briefly, for retrial purposes, to the third point urged by appellant relating to the testimony of the Government's principal witness, Jose Guzman, at a prior trial.

Guzman, an undercover New York City police detective, negotiated on January 11, 1972, with Jose Sanjurjo ("Jose") for the purchase of an ounce of heroin for $1,000. The deal was consummated seven days later at the same location at which the preliminary negotiations had taken place, 121st Street and Second Avenue. By prearrangement between Sanjurjo and Guzman, codefendant Ortiz, after emerging from a club at 2353 Second Avenue, gave Guzman a package containing the heroin on the street and received the cash in the hallway at 2353. Appellant Torres is not demonstrated to have had any connection with this January transaction.

On February 14, 1972, Guzman returned to the club and spoke with Ortiz about purchasing an eighth of a kilogram of heroin. Because Jose was supposedly in Puerto Rico, Guzman was to return later that evening to complete the sale with a close relative of Jose, Jesus Sanjurjo ("Jesus"). Guzman did return and Ortiz joined him in his car. Jesus Sanjurjo came to the car, and a deal was made at $3,600. Guzman said he wanted to speak to Jose before the sale was completed. Jesus went off in a white car only to return to say that Jose's instructions were to deal with him, Jesus. Guzman insisted, however, and Jesus

---

* Of the Southern District of New York and Central District of California, respectively, sitting by designation.

1. Appellant was sentenced to one year's imprisonment on May 17, 1974, following a three-day trial before District Judge Wyatt and a jury.

went off again, returning to tell Guzman that Jose—by now plainly not in Puerto Rico—would see him around the corner at 120th Street.

Guzman walked down Second Avenue, turned the corner, and saw the white car which Jesus had been driving, Jose standing next to it and appellant Torres in it. Jose said he would complete the sale on this occasion but future dealings were to be with Jesus. Guzman went back to his own car where Ortiz and his wife, Lillian, were waiting. Guzman was told to drive with Lillian to 100th Street and First Avenue, and he did so followed by the white car containing Jesus and Torres. There Torres got into Guzman's car and told him to drive back to 120th Street and First Avenue where Torres said he would pick up the "package" or the "material." Because the heroin was a large amount, it was explained, the "connection" had to protect himself and Jesus would follow them to make sure the police were not behind.

At 120th Street and First Avenue, Lillian and Torres left Guzman's car, Torres saying he would bring the "package." Lillian returned shortly and drove with Guzman to 96th Street and Second Avenue, Torres and the others trailing in the white car. Guzman parked. Torres again appeared to say he was going to bring the package; Torres and Lillian left and after a half-hour wait no one appeared. The sale was not completed.

Eight days later Guzman tried again to negotiate a sale with Jesus after motioning him from the white car in which he and Torres were sitting in front of the club at 2353 Second Avenue. In Torres' hearing Jesus Sanjurjo negotiated for Guzman's purchase for an ounce of heroin. When Guzman returned that evening as directed no one appeared, so that the third sale was likewise not completed. Guzman's and the others' maneuvers had been under surveillance at all material times.

■ On the question of sufficiency, appellant argues that the "single act" of Torres agreeing to deliver the February 14 heroin was insufficient to draw him into the broader conspiracy to violate the narcotics laws that was charged. He relies upon a line of cases in this circuit exemplified by United States v. DeNoia, 451 F.2d 979, 981 (2d Cir. 1971); United States v. Aviles, 274 F.2d 179, 190 (2d Cir.), cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1010 (1960); United States v. Stromberg, 268 F.2d 256, 267 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959), and United States v. Reina, 242 F.2d 302, 306 (2d Cir.), cert. denied, 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427 (1957). These cases all involve large, multiparty conspiracies. Their teaching is that absent proof of knowledge of the broader conspiracy, a single act such as delivery of the drugs (*DeNoia; Stromberg*) or actual sale (*Reina*) or purchase (*Aviles*) is insufficient evidence from which to draw an inference that a defendant knew about or acquiesced in the larger conspiracy.

■ Appellant's line of cases, however, recognizes that a single act may be "sufficient for an inference" that a given defendant "was involved in a criminal enterprise of substantial scope, which was likely to involve other persons." United States v. DeNoia, 451 F.2d at 981. Where the "single act" is such as to justify an inference of knowledge of the broader conspiracy, that is sufficient. *See, e. g.,* United States v. D'Amato, 493 F.2d 359, 365 (2d Cir.), petition for cert. filed, 43 U.S.L.W. 3002 (U.S. Apr. 11, 1974) (No. 73–1527); United States v. Barrera, 486 F.2d 333, 337 (2d Cir. 1973), cert. denied, 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291; United States v. Pui Kan Lam, 483 F.2d 1202, 1207–1208 (2d Cir. 1973), cert. denied, 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (U.S. Mar. 19, 1974) (No. 73–5714); United States v. Calabro, 449 F.2d 885, 892 (2d Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 801, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972). See also United

States v. Terrell, 474 F.2d 872, 875–876 (2d Cir. 1973).

■■■ The "single act" or single transaction in each of the appellant's cases was only a minor phase of a large, multiparty ring conspiracy. *See, e. g.,* United States v. Aviles, 274 F.2d at 182–188. Here the alleged conspiracy itself was much less broad, involving only four known parties, one transaction and two attempted sales occurring in a three month period. In a conspiracy of small scope, such as this one, the evidentiary value of a "single act" in inferring knowledge, particularly when, as here, the "act" included statements by the defendant indicating his knowledge of the conspiracy and the "act" was one in which all the coconspirators were involved, is correspondingly greater than it would be in a broad conspiracy: the single act or transaction forms a larger proportion of the entire scheme. Thus, to speak of a "single act" is misleading; rather it is the qualitative nature of the act or acts constituting the single transaction (purchase, delivery, or the like) viewed in the context of the entire conspiracy which will determine whether an inference can be drawn as to the actor's knowledge of the scope of the conspiracy. Indeed, *Aviles* recognized this when then Chief Judge Lumbard speaking for the court said, "Thus, when two men join together to commit a single robbery, one may infer from their common participation in the robbery that they have conspired to commit the robbery." 274 F.2d at 189. Thus conduct consisting only of involvement in a single transaction may nevertheless be treated as rationally permitting the inference of knowledge of the broader conspiracy where the single act itself shows so much familiarity with or high-level participation in the overall conspiracy as to be in and of itself indicative of the broader conspiracy. *See* United States v. Aviles, 274 F.2d at 190; United States v. Agueci, 310 F.2d 817, 836 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

Appellant Torres was intimately connected with the February 14 transaction and besides participating in it until it aborted, was in Jesus Sanjurjo's car when Guzman approached it to speak with Jose about dealing with Jesus in the future. Torres rode in Guzman's car and told him to drive back to the initial meeting spot at 120th Street and First Avenue where Torres said he would pick up the "package" of heroin. He was in the car when either he or Lillian explained that the "connection" must be protected. Torres trailed Lillian and Guzman on their final trip down Second Avenue. Beyond this, Torres was in the white car at 2353 Second Avenue when he heard Jesus negotiate with Guzman for the purchase of an ounce of heroin on February 22.

■■■ Of course, mere presence at a site where a narcotics sale is planned but not consummated is insufficient to support a conspiracy conviction where there is no evidence that the purpose of the meeting is known to the alleged conspirator. *See* United States v. Cirillo, 499 F.2d 872 (2d Cir. 1974). Here, however, there was actual knowledge on the part of the appellant that a heroin sale was about to take place. In the scope of the Sanjurjo-Ortiz operation, Torres was willingly taking a leading role in the attempted completion of the February 14 transaction.[2] We therefore think the evidence was sufficient.

---

2. Although the transactions with which Torres was involved were mere attempts, a conspiracy is punishable even if unsuccessful. United States v. Rabinowich, 238 U.S. 78, 86, 35 S.Ct. 682, 59 L.Ed. 1211 (1915); United States v. Abel, 258 F.2d 485, 489 (2d Cir. 1958), aff'd, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). In any event the January sale and February transactions tend to show the existence of a continuing narcotics operation at or near 2353 Second Avenue. While Torres was not shown to have been connected with the January sale,

[t]he rule is clear that one who joins an existing conspiracy takes it as it is, and is therefore accountable for the prior conduct of co-conspirators.

We reverse the conviction, however, as a result of the cumulative effect of three errors. The Government called as a witness Hector Ortiz, a codefendant who pleaded guilty and was awaiting sentence. Prior to his being called before the jury, a hearing was conducted in the presence of the judge, as suggested in United States v. Sanchez, 459 F.2d 100, 103 (2d Cir.), cert. denied, 409 U.S. 864, 93 S.Ct. 156, 34 L.Ed.2d 112 (1972). The Court ruled that he could be called as a witness and treated by the Government as hostile. He was so called and testified as to his involvement with Jose Sanjurjo and Jesus Sanjurjo in the heroin transactions of January 18 and February 14, 1972, but denied knowing who was going to deliver the heroin on February 14. He testified first that he did not know Torres and later that he knew him only by sight. He denied stating to federal agents during the previous week that Torres was supposed to make the February 14 delivery and that Torres was employed by Jose Sanjurjo as a narcotics courier between New York and Puerto Rico. The Government then called Assistant United States Attorney Robert Hemley, who had been sitting at the Government counsel table. Hemley testified that he had seen Ortiz and Torres shake hands, embrace and converse for five minutes the previous day. In summation the Government argued that Hemley's testimony showed that Ortiz was lying to protect Torres and did not want to tell the jury that his friend Wilson Torres "was the guy who sold heroin." Error lay in asking Ortiz if he had said that Torres was a narcotics courier, in using Assistant United States Attorney Hemley as a witness and in characterizing Torres as the "guy who sold heroin" in summation.

The question as to whether or not Ortiz had said that Torres was a narcotics courier for Jose between New York and Puerto Rico was itself improper. Without more, it could not have been used at trial as affirmative evidence to prove that Torres was a participant in the conspiracy at issue. Acting as a courier was not one of the overt acts alleged in the indictment. Evidence that Torres had been a courier in the past would not be admissible to prove that Torres was the courier in February. 1 J. Wigmore, Evidence § 192 (3d ed. 1940). Even if it were, there was no foundation to show that Ortiz had first-hand knowledge rather than hearsay information of that fact.[3] An improper question is not made proper by virtue of being asked on cross-examination. 3A J. Wigmore, supra, § 1020. This court said in United States v. Cunningham, 446 F.2d 194, 197 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971), quoting from Kuhn v. United States, 24 F.2d 910, 913 (9th Cir.), modified on other grounds on rehearing, 26 F.2d 463, cert. denied, 278 U.S. 605, 49 S.Ct. 11, 73 L.Ed. 533 (1928), "[t]he maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer by which the party is surprised . . . ." The question here went beyond cancelling the adverse answer as to whether Torres was to deliver the heroin. It had all the prejudicial effect from which the rule against introducing evidence of prior bad acts was designed to protect. 1 J. Wigmore, supra, § 192.[4]

---

United States v. Sansone, 231 F.2d 887, 893 (2d Cir.), cert. denied, 351 U.S. 987, 76 S. Ct. 1055, 100 L.Ed. 1500 (1956). The jury may be taken to have found that Torres had joined an already established conspiracy.

3. Concededly, hearsay from a coconspirator might, however, be admissible once Torres were shown to be a member of the conspiracy. United States v. D'Amato, 493 F.2d 359 (2d Cir.), petition for cert. filed, 43 U.

S.L.W. 3002 (U.S. Apr. 11, 1974) (No. 73–1527).

4. It would make no difference if Ortiz had affirmed his supposed prior statements or if indeed the statements referred to in the question had actually been introduced into evidence (unless of course they related to Torres' direct participation in this conspiracy). The prior statement was as to Torres' having at some time been a courier,

Secondly, it was erroneous to permit Hemley to testify as to the courtroom encounter between Ortiz and Torres. No foundation had been laid for this impeachment because Ortiz had never been questioned about this incident. There was no showing that any of the other people who were in the courtroom at the time Ortiz and Torres allegedly conversed, such as marshals, court clerks, court reporters or interpreters, were unavailable to testify. *See* United States v. Alu, 246 F.2d 29, 33–34 (2d Cir. 1957). A Government prosecutor should not take the stand to impeach the testimony of Government witnesses unless it is unavoidably necessary. United States v. Pepe, 247 F.2d 838 (2d Cir. 1957). Sitting at the counsel table constitutes sufficient participation in the trial as to permit the calling of the prosecutor only if and when a proper foundation has been laid for impeachment and all other sources of possible testimony have been exhausted. The rule as stated by *Alu* is that "lawyers representing litigants should not be called as witnesses in trials involving those litigants if such testimony can be avoided consonant with the end of obtaining justice." 246 F.2d at 33. *See also* United States v. Mullings, 364 F.2d 173, 175 n. 1 (2d Cir. 1966). The court below was well aware of the problems that the Government was engendering for itself and indicated that it was up to the Government to determine whether it wished to take the risk of infecting the record with error. The Assistant United States Attorney in charge replied, "I take it we will go forward and the Government will assume the risk."

The prosecutor compounded the errors above by arguing from Hemley's testimony that Ortiz did not want to tell the jury that Torres "was the guy who sold heroin." In so doing the prosecutor created an implication that the impeachment testimony was affirmative evidence despite the judge's prior limiting instruction. In fact, there was no direct evidence that Torres had ever sold narcotics. Defense counsel specifically objected to the prosecutor's remarks as "violently unfair" and, after the summation, moved for a mistrial based on the prosecutor's misstatements of record in summation, specifying the prosecutor's "attempt to have the jury draw the opposite conclusions from what Mr. Ortiz testified to. · . . ."

There was thus error in the form of the question asked, in calling Hemley as a witness, and in the prosecutor's comments on both. Cumulatively, these errors were certainly not harmless. The trial was a short one and would have turned almost entirely on the credibility of Guzman's testimony were it not for the errors committed as we have recounted. They therefore demand a new trial.

Complaint is also made on appeal that appellant's counsel was limited in his cross-examination of Guzman. On cross-examination of Guzman it was established that inculpatory conversations Guzman claimed he had with Torres or in his presence were neither in his report of investigation made two days after February 14 nor mentioned in his testimony at a prior trial of codefendant Jesus Sanjurjo. The conversations in question included the response to his complaint to Torres and Lillian Ortiz that he was annoyed over driving up and down between 100th Street and 120th Street to pick up the February 14 heroin since he was fearful of "getting burned" or that his car was going to get "burned." Guzman testified at Torres' trial that either Lillian or Torres replied that "The connection had to take care of

not as to whether he was to deliver the heroin in the February 14 transaction (or any other in the scope of this conspiracy). Thus, the specific instruction given by the trial court to the effect that any prior statement made by Ortiz after his arrest could not be considered as affirmative evidence against Torres, while helpful, did not go far enough; the question, which was objected to, should have been excluded.

himself because this was no little package." On redirect the prosecutor asked Guzman whether he had been asked at the trial of Jesus Sanjurjo about the conversation with Torres, and he replied that he had not, and that he had testified to conversations with Jesus Sanjurjo at Jesus' trial which conversations he had not recounted in detail at the trial below. In fact, the transcript of the Jesus Sanjurjo trial shows that agent Guzman testified in detail regarding the events of February 14, 1972, and those details were the very same, and included the same conversations, that he had testified to at the Torres trial with the exception of the single "burning" conversation with Torres (or in his presence). Thus the implication of Guzman's testimony that there were other conversations with Jesus Sanjurjo not testified to at the Torres trial was not wholly accurate. When defense counsel attempted to ask clarifying questions and offered in evidence the Sanjurjo trial transcript, Government counsel objected and the evidence was not received. Where the testimony of the Government agent as here is the main evidence on which the Government relies, we think the limitation of cross-examination—while discretionary with the court in the case of repetition, of course—was unwise, even if not necessarily reversible error. The prior transcript would have established the inaccuracy of Guzman's testimony about the existence of other conversations with Jesus Sanjurjo, and this in turn could have tended to discredit further the prosecution's main witness.

■ We find no error whatsoever in the prosecutor's saying, "I submit that Guzman's testimony was wholly credible. There is no reason in the world why you should disregard his testimony." This was by no means a case of the prosecutor's personally vouching for Guzman's credibility.

Judgment reversed and remanded for a new trial.