**UNITED STATES of America**

**v.**

**Alfredo AVILES et al., Defendants.**

United States District Court
S. D. New York.
May 1, 1961.

Robert M. Morgenthau, U. S. Atty., Jerome J. Londin, Executive Asst. U. S. Atty., New York City, Herbert B. Greene, New York City, Ezra H. Friedman, Gerald E. Paley, Asst. U. S. Attys., Brooklyn, N. Y., of counsel, for plaintiff.

Edward Bennett Williams, Washington, D. C., Wilfred L. Davis, New York City, Robert L. Weinberg, Washington, D. C., of counsel, for defendant Vito Genovese.

Roy L. Reardon, New York City, for defendant Charles Barcellona.

Albert J. Krieger, New York City, for defendants Charles DiPalermo & Joseph DiPalermo.

Maurice Edelbaum, New York City, for defendant Natale Evola.

Davis & Krieger, New York City, Wilfred L. Davis, Albert J. Krieger, New York City, of counsel, for defendant Vincent Gigante.

Abraham Brodsky, New York City, for defendants Nicholas Lessa & Daniel Lessa.

Henry K. Chapman, New York City, Irving Rader, New York City, of counsel, for defendant Rocco Mazzi.

David Schwartz, New York City, for defendant Carmine A. Polizzano.

Allen S. Stim, New York City, for defendant Ralph Polizzano.

Herbert S. Siegal, New York City, for defendant Salvatore Santora.

BICKS, District Judge.

Vito Genovese, Carmine A. Polizzano, Ralph Polizzano, Charles Barcellona, Natale Evola, Salvatore Santora, Rocco Mazzie, Vincent Giganti, Nicholas Lessa, Daniel Lessa, Joseph DiPalermo and Charles DiPalermo, move pursuant to

Rule 33 of the Fed.R. of Crim.Proc., 18 U.S.C.A. for a new trial.

These defendants were charged in a one count indictment, Criminal 156–157, with conspiracy to violate the narcotics laws, 21 U.S.C.A. §§ 173, 174, and were tried before this court and a jury from January 5, 1959 through April 3, 1959, the jury returning a verdict of guilty as to each of the movants.

An appeal was taken by petitioners from their judgments of conviction and in each case the convictions were unanimously affirmed. United States v. Aviles, 274 F.2d 179, 2 Cir., 1960. The Supreme Court denied certiorari. Evola v. United States, 1960, 362 U.S. 974, 982, 80 S.Ct. 1057, 4 L.Ed.2d 1009.

Hearings were held before this court on these motions. Petitioners have put forward certain grounds which they contend entitle them to a new trial. These are, first, alleged recantations of trial testimony by the principal government witness; second, statements at the hearing on these motions allegedly inconsistent with testimony adduced at the trial; third, alleged new extrinsic evidence with respect to aspects of the main government witness' trip to Las Vegas; fourth, alleged concealment at the trial of a rent record in the possession of the government; fifth, alleged post trial perjury totally discrediting the trial testimony of the main government witness; and sixth, alleged spoliation of government agents' notes in violation of the Jencks Act, 18 U.S.C.A. § 3500.

At the outset there is presented the question of the applicable rule for determining whether alleged post-trial recantations should be the basis for the granting of a new trial. Rule 33 of the Fed.R. of Crim.Proc. broadly provides that "the court may grant a new trial * * * if required in the interest of justice." The cases have amplified the general language of the Rule.

█ In general the federal courts have applied the Berry rule [1] which re-

quires an applicant for a new trial on the ground of newly discovered evidence to show the following elements:

"(a) The evidence must be in fact, newly discovered, i. e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." Johnson v. United States, 32 F.2d 127, 130, 8 Cir., 1929.

However, a special rule is applied where an alleged recantation of trial testimony is involved or where it is proven that false testimony was given at the trial. Under the latter rule—commonly known as the Larrison [2] rule—a new trial should be granted where:

"(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

"(b) That without it the jury might have reached a different conclusion.

"(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." United States v. Hiss, D.C. S.D.N.Y.1952, 107 F.Supp. 128, 136, affirmed 2 Cir., 1953, 201 F.2d 372, certiorari denied 1953, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368.

The Larrison test has been applied by the Court of Appeals for this Circuit [United States v. Troche, 2 Cir., 1954, 213 F.2d 401] and by this court [United States v. Flynn, D.C.S.D.N.Y.1955, 130 F.Supp. 412, 413]; United States v. Hiss, supra.

Several Alleged Recantations.

█ At the hearings on these motions counsel for the petitioner Genovese in-

1. Berry v. State of Georgia, 10 Ga. 511.

2. Larrison v. United States, 7 Cir., 1928, 24 F.2d 82, 87.

troduced evidence of several purported recantations of Nelson Cantellops, the principal government witness at the trial. At the outset, it is clear from a perusal of the transcript of this hearing that Nelson Cantellops categorically denied the veracity and efficacy of each and every supposed recantation of trial testimony, and he reaffirmed his trial testimony. The petitioners do not deny this but attempt to urge upon this Court that the statements made by Nelson Cantellops in the several alleged recantations were true, while the retractions of these at the hearing were false. The circumstances surrounding each alleged recantation incline the Court to the view that they were the result of coercion, bribery and misdealing and, therefore, entirely unworthy of belief.

For convenience the alleged recantations of trial testimony may be described as, first, the Mount Carmel Church episode; second, the July 20th episode and the July 22nd episode and, finally, the Frasca episode.

### Mount Carmel Episode.

Between the 1st and the 15th of January, 1960, Nelson Cantellops received phone calls from unidentified callers to the effect that he would be paid money if he recanted certain parts of the testimony given by him on the trial of this case. Ultimately, John Ormento, one of the defendants named in the indictment, who was a fugitive at the time of the trial, made a call and threatened Cantellops that unless Cantellops agreed to go along with Ormento's plan, all would not go well for him. This threat was complemented by the statement of Ormento that Cantellops would receive $3,000 as a down payment with up to $30,000 to follow if Cantellops would agree to alter his trial testimony in the manner and in the particulars dictated by Ormento.

About January 20th or January 22nd Ormento met Cantellops at a bar on Tremont Avenue. A second meeting was held on Sunday, January 24th at the My Good Neighbor Restaurant. At these meetings Ormento asked Cantellops to make a recantation at a meeting to be held in the rectory of the Mount Carmel Church. Ormento furnished the statement that he wished Cantellops to make. No part of the proposed statement was suggested by Cantellops.

On Sunday, January 24, 1960 Herbert S. Siegal[3] received a phone call from John Ormento in which Mr. Ormento allegedly asked Mr. Siegal to assist Ormento in determining whether a Puerto Rican man with whom Ormento was dealing was in fact Nelson Cantellops. Mr. Siegal allegedly stated to Ormento that he did not wish to assume the "responsibility" himself and that he would call Mr. Amadeo L. Lauritano to assist him in making the identification. Mr. Lauritano[4] did not represent a defendant tried with these petitioners although he was present during portions of the trial and observed Nelson Cantellops on the witness stand.

Mr. Siegal met Mr. Lauritano and John Ormento on 149th Street in the Bronx near or in front of the Lauritano Restaurant. The three agreed that after Mr. Siegal completed some errands, they would meet in the parking lot of the Howard Johnson's Restaurant, 138th Street and Bruckner Boulevard in the Bronx.

After the meeting in the parking lot Mr. Ormento rented a car from a rental agency nearby. Immediately thereafter, Ormento, driving his rented car, followed by Mr. Lauritano and Mr. Siegal in another car drove to the My Good Neighbor Restaurant in the East Bronx. Mr. Ormento's rented car stopped in front of the restaurant while the car in which Mr. Siegal and Mr. Lauritano were riding passed the Ormento vehicle, made a U turn, and parked across the street. Mr. Ormento entered the restaurant. Mr. Siegal and Mr. Lauritano left their ve-

---

3. Counsel for Salvatore Santora.

4. Mr. Lauritano, an attorney, represented one Pappadio, a defendant named in the indictment as to whom a severance was granted.

hicle, crossed the street and walked slowly by the front of the restaurant looking inside allegedly in order to identify the Puerto Rican man who Ormento suspected to be Nelson Cantellops.[5]

Mr. Lauritano and Mr. Siegal then had a sandwich and returned to walk by the restaurant a second time for purposes of making the alleged identification. Mr. Siegal testified that Mr. Lauritano and he were unable to identify the man sitting with John Ormento and that although they felt that there was nothing to fear and there was every reason to make an absolute identification, they did not wish to appear obvious and, therefore, did not enter the restaurant. Mr. Lauritano and Mr. Siegal then returned to the car rental agency in the Bronx where they waited for Mr. Ormento's return.

On or about the next day Ormento called Mr. Siegal and told Mr. Siegal that he had made an arrangement whereby Cantellops would go to the Mount Carmel Church to make a recantation. Ormento asked Mr. Siegal to be present to "take" the statement. Mr. Siegal was advised by a later phone call that Ormento or another had made an arrangement with Bishop Perricone whereby Cantellops would make his statement before the Bishop. The evidence at this hearing as to the arrangements for the Mount Carmel Church meeting is conflicting. Mr. Lauritano's testimony was that he had nothing to do directly or indirectly with arranging the Mount Carmel Church appointment, while witness Pizzo's testimony indicates the contrary.

Mr. Siegal testified that he spoke with Bishop Perricone and the Bishop advised him that he would participate in the conversation but that if he were busy he would assign a parish priest.

After waiting twenty or twenty-five minutes after the appointed time Mr. Siegal allegedly left the church, went across the street, and made some phone calls. After making the phone calls Mr. Siegal stood on the sidewalk across the street from the Mount Carmel Church and observed a Spanish man walk into the church. After observing this, Mr. Siegal used a coin telephone to call the rectory of the Mount Carmel Church and advised a secretary there that the person who was to arrive had not arrived. To be noted is that Cantellops' testimony as to the first appointment at the Mount Carmel Church was to the effect that he was present at the appointed time and place, that Ormento and the others were there too, that Siegal was on the sidewalk opposite the church and that "everybody run away" leaving the witness there alone. Cantellops suspected that their hasty departure was occasioned by the fear that a government agent had accompanied him to the rendezvous. Cantellops then testified that the secretary in the rectory communicated Mr. Siegal's request that Cantellops be told to proceed to Mr. Siegal's office which he did.

When Cantellops arrived at Mr. Siegal's office he found Ormento there and shortly thereafter Mr. Siegal arrived. On Siegal's arrival he found Cantellops and Ormento alone in Siegal's private office. Mr. Siegal testified that he could not recognize the man talking to Ormento to be Nelson Cantellops. He allegedly signaled Ormento from behind Cantellops that the man with whom Ormento was engaged in conversation was not Cantellops.

Ormento then allegedly confronted Cantellops, saying "You are not Cantellops". After a conversation in which certain instances at the trial were recalled, Mr. Siegal was satisfied that this

5. Of course, it is movants' position that Cantellops, who testified extensively at the trial regarding his dealings with Ormento, did not in fact know Ormento and hence Ormento sought out the assistance of Mr. Siegal who was present throughout the protracted trial proceedings to assist in the alleged identification of Cantellops. Suffice to say at this point that the Court does not place any credence on this testimony. It is difficult for the Court to comprehend why Mr. Siegal would require the aid of Mr. Lauritano when Mr. Siegal was present throughout the trial and participated in extensive cross examination of Cantellops.

was Nelson Cantellops. As previously noted, the Court regards as unbelievable the interplay concerning the identification of Cantellops, whom the Court found to be an unforgettable individual.

Siegal testified that Cantellops asked for a piece of paper upon which to write out a statement; Cantellops also asked whether Siegal had a notary in the office. After Siegal's reply in the negative to the latter question, Ormento allegedly offered to get the notary that he had at the church, suggesting it would take twenty to thirty minutes for him to arrive. As Cantellops took a pad given him by Siegal, Siegal went to the outer office, leaving Cantellops alone with Ormento. When the notary arrived, Siegal's testimony continues, Siegal ushered him into his private office where Cantellops then had a written statement in front of him allegedly retracting in several particulars his trial testimony as to Ormento and Galante. After Siegal's secretary allegedly witnessed it, the notary "signed it and swore to it and so forth" and asked Cantellops if it was true. As Siegal reached over for the statement, Cantellops took it away, allegedly stating to Siegal, "this isn't for you."

On January 27, 1960, Cantellops appeared at the rectory of the Mount Carmel Church. He was there met by Wilfred L. Davis, Amadeo L. Lauritano, and Herbert S. Siegal. A priest was also present. Mr. Lauritano had a recording device concealed in a brief case standing on the floor of the room. Neither the priest nor Mr. Cantellops was advised of the presence of a recording device, although Mr. Davis and Mr. Siegal were aware of its presence. A notary was then called and upon his arrival Mr. Cantellops produced a written statement previously prepared which in substance parallels the form of statement which Cantellops testified Ormento had previously furnished him. The movants produced a recording which allegedly was made at the Church and, without belaboring the point, the Court after having in-

tently listened to the recording on two separate occasions has concluded that it imparts no significant intelligence.

Cantellops testified that the next day he went to the office of Herbert S. Siegal and there received a sum of money from John Ormento and that the payment was made in cash, in bills of one hundred dollar denominations. Cantellops repudiated the January 27th recantation as the product of fear and bribery in statements to members of the United States Attorney's Office and the Bureau of Narcotics on February 2, 1960 and in testimony before the Grand Jury on February 3, 1960. At the beginning of February, 1960, Cantellops turned over to the government five one hundred dollar bills which he claimed were part of the $3,000 [6] down payment from John Ormento for the recantation.

### July 20th and July 22nd Episodes.

Around June of 1960 Nelson Cantellops received a telephone call from John Ormento. Pursuant to this telephone call Cantellops met Ormento at a restaurant in the Bronx. Cantellops testified that he there told Ormento that he did not want to have any more to do with the situation and that he wished to wash his hands of this business.

Soon thereafter Cantellops received a note, hand delivered to his home. The note asked Cantellops to make a phone call to a specified number at a specified time. Cantellops phoned the number and Mr. Herbert S. Siegal's secretary answered. Mr. Siegal asked Cantellops if Cantellops could meet Siegal at Siegal's office.

On July 14th Mr. Siegal met Cantellops in front of Mr. Siegal's office building on East 149th Street in the Bronx. According to Cantellops' testimony, Siegal stated that Cantellops could be helpful if he would go along with the testimony of one Jose Linares, and to change in several respects Cantellops' trial testimony about the Las Vegas trip alluded to in some detail at the trial of these peti-

6. The variation in Cantellops' testimony as to the amount of the alleged bribe is noted infra.

tioners. Cantellops accompanied Mr. Siegal upstairs to Mr. Siegal's office where a conversation ensued.

On July 13, 1960 Mr. Siegal issued a check to the order of Asco Sound Corporation in part payment of the purchase price of a tape recording device. The machine was installed in his office several days thereafter. The tape and the actual recording device were in an innocuous looking cabinet next to the desk of Mr. Siegal's secretary in the outer office. The microphone was secreted in the mouthpiece of the telephone on Mr. Siegal's desk. The machine's operation was controlled by the secretary outside. Mr. Siegal testified that the telephone company was not advised of the installation of the recording equipment in his telephone and that no beep signal was used, because the equipment was not installed for the purpose of recording telephone conversations.

On July 20, 1960 Cantellops arrived at Mr. Siegal's office. The two had a conversation in which Cantellops allegedly retracted his trial testimony in several particulars. This conversation was purportedly recorded on Court's Exhibit 5, a tape produced by Mr. Siegal and played at the instant hearing. A substantial portion of the tape does not contain intelligible conversation and upon listening to it, the auditor experiences significant shifts in tape speed and fidelity. Quite apart from these intrinsic difficulties with the tape, Mr. Siegal's testimony to the effect that the equipment purchased by him on July 13th was used to make the entire recording, was directly refuted by Mr. Isaac Reiter, an expert witness who had sold the machine to Mr. Siegal:

"Q. Mr. Reiter, have you formed an opinion as to whether court Exhibit 5 is a tape which recorded a conversation on the tape recording machine that you sold to Mr. Siegal? A. Well, I'd say the first half of it wasn't.

"Q. You would say the first half of it wasn't? A. The part that isn't on speed wasn't."

On July 22, 1960, Cantellops again appeared at Mr. Siegal's office and the two again had a conversation in which many of the aspects of the July 20th conversation were repeated and reiterated. The recording device was then allegedly used to contemporaneously record their conversation. Court's Exhibit 6, a tape purporting to be an accurate reproduction of the July 22nd conversation, was produced by Mr. Siegal and played at these hearings. Court's Exhibit 6 differs from Court's Exhibit 5 in that the former is a more intelligible reproduction of a conversation in which a voice which the Court recognized as that of Mr. Siegal propounds a series of long, leading questions which are answered by a man of pronounced Spanish accent in largely monosyllabic responses. No response to certain questions was heard. The purported recording of both these conversations was accomplished without the knowledge of Mr. Cantellops.

Cantellops testified that he talked with Siegal before entering Siegal's office and that Siegal gave him "a lay-down of what he wanted done, more or less." Cantellops also testified that he "told Mr. Siegal a lot of things that were on rehearsal at that time, because that was a rehearsal of what they wanted me to say." Cantellops stoutly maintained at the hearing on these motions that statements made by him tending to differ from his trial testimony were the product of suggestion and duress.

The pressures to which Cantellops had been subject prior to the July recantations continued thereafter, during the time when he was in prison as a parole violator. Letters from Candida Velez to Nelson Cantellops, while the latter was incarcerated (Defendants' Exhibit G–1 through G–3) indicate that a man came to visit her at her home, gave her money and promised her a new refrigerator if she would intercede in behalf of the man's friends by advising Cantellops of the gifts. For example, in a letter of November 9, 1960, Candida Velez wrote, "That man told me that he was going to bring me a new refrigerator. I want

you to tell me what to do. He said for you to please help him."

At the hearings Candida Velez testified that the man who importuned her to intercede with Nelson on his behalf and on the behalf of those he represented was Joseph Marino. Mr. Marino appeared at the hearing but invoked the protection of the Fifth Amendment.

Under all the circumstances the Court is inclined to the view that no credence may be placed in the conversations which, so far as intelligible and audible, are reproduced in Court's Exhibits 5 and 6, since they were forced and cajoled, not made under oath, and the product of bribery.

### The Frasca Episode.

An article entitled "I Squealed on the Mafia" bearing the byline "by Nelson Cantellops with Don Frasca" appeared in the October 1960 issue of Man's Magazine. It is a highly fictionalized account of several of the episodes which form the matrix of the trial testimony in this case although it is based upon alleged conversations between Cantellops and Don Frasca, a reporter for the New York Journal American who prepared the article.

The petitioner Genovese contends that the article is so inconsistent with the trial testimony of Nelson Cantellops as to require the granting of a new trial. The article, so far as it relates to the subject matter of the trial testimony, is more of a reaffirmation of such testimony than a recantation thereof. There are, however, certain inconsistencies between the article and the trial testimony and the article contains substantial material which was not even alluded to at the trial. In any case, the unsoundness of according the same weight to fictionalized narratives of the subject matter of trial testimony as is accorded to testimony given under oath and tested by intensive cross-examination in a court of law is patent. This is particularly so where the real author contents himself with devoting some twenty minutes to a 6,700 page transcript of a trial which consumed the better part of three months; where there were conceded journalistic "embellishments"; where there were sources other than Cantellops for at least some of the material contained in the article; and where appeal to a particular type of reader rather than accuracy was the apparent objective. Further, Cantellops denies having furnished Frasca with the entire contents of the article, and indicates that he referred Frasca to the trial record.

Even under the less rigid Larrison test there must be evidence sufficient so that the Court can fairly state that it is "reasonably well satisfied" that the testimony given at the trial by a material witness is false. The court having presided at the protracted trial proceedings and the hearings on the instant applications which consumed many days, and having had the benefit of two playings of the tapes containing the alleged recantations,[7] and having observed first-hand the demeanor of the witness Cantellops and the other witnesses whose testimony bears on the alleged recantations, can hardly conclude that it is "reasonably well satisfied" that the witness Cantellops' trial testimony was false and the alleged recantations were true. On the contrary all the credible evidence points to the intrinsic unreliability of the alleged recantations and their having been obtained as the result of bribery and duress.

As the Court of Appeals for the Second Circuit has stated:

"Where the newly discovered evidence consists of recantation of testimony given at the trial, such recantation is 'looked upon with the utmost suspicion,' as this court

7. The Court, desirous of refreshing its recollection as to the contents of the above mentioned tapes, arranged to have the tapes replayed for the benefit of the Court on April 25, 1961. All counsel were invited to attend and on this occasion the same machine and the same expert to operate the machine were again employed.

pointed out in Harrison v. United States, 2 Cir., 7 F.2d 259, 262. The motion should be granted only when 'the court is reasonably well satisfied that the testimony given by a material witness is false,' and particularly is this true when the recantation has itself been repudiated." United States v. Troche, supra, 213 F.2d at page 403.

### Alleged inconsistency between trial testimony of Cantellops and his testimony at this hearing.

Counsel for the movant Genovese strenuously urges that the alleged variance between the trial testimony of Cantellops and his testimony at the hearings on this motion concerning the number of times that Cantellops observed Genovese in the East 4th Street area requires a new trial. Counsel points out that at the trial the witness Cantellops testified as follows:

"Q. Where had you seen him [Genovese]? A. I seen him on 4th Street in the east side between Third and Second Avenue.

"Q. Do you recall approximately when that was? A. In the late part of the spring of '56 or beginning of summer.

"Q. And what was he doing? A. He was talking with—he was speaking with Carmine Polizzano over there.

"Q. What did you do? A. I came in to see Carmine Polizzano and I didn't know who this other gentleman was and I was told to wait. After they finished talking Carmine told me never to interfere when he was talking to the right man.

"Q. And whereabouts was this that Genovese was talking to Carmine? A. Between the 82 Club and the Old Landmark.

"Q. Was it in the street? A. In the street, yes, sir.

"Q. Were they standing in the street? A. No, he was in the car

and Carmine was outside the car standing close to the car.

"Q. Was Genovese in the car? A. Yes.

"Q. Did you have occasion to see him again? A. Another time, but I didn't interrupt, I waited until they finished up talking.

"Q. Where did you see him on that occasion? A. In the same place.

"Q. And what was he doing when you saw him then? A. They were talking.

"Q. Who was talking? A. Carmine and this gentleman." (Trial Tr. 1298–99)

At the hearing of the motions *sub judice* the testimony of the witness Cantellops was as follows:

"A. I saw him, all together in this transaction, three times, once in Fourth Street, once in the restaurant and again during the meeting." (Tr. 212)

When counsel inquired of the witness as to the apparent discrepancy in his testimony concerning the number of times that he had observed the movant Genovese, Cantellops explained that:

"Q. So that your testimony now is whatever you said there you intended only to testify to one occasion when you saw Mr. Genovese with Mr. Polizzano; is that right? A. Yes, I was testifying more or less the first time." (Tr. 214)

Counsel for the petitioner Genovese, although calling to the Court's attention the previously quoted trial testimony of Cantellops on his *direct* examination, fails to consider the cross-examination of that witness at the trial by Genovese's trial counsel. On that cross-examination the following testimony was given:

"Q. * * * Now on your direct examination * * * you testified essentially to the following as to Mr. Genovese: That you saw him once or twice in the late spring or the early summer of 1956 talking to Mr.

Carmine. Polizzano; do you remember that? A. Yes." (Trial Tr. 2861.)

Not without significance is the fact that counsel for Genovese did not inquire further after having asked at these hearings about the apparent discrepancy in the number of occasions on which Genovese was observed. Indeed the circumstances of each of the two Fourth Street incidents, if in fact there were two such meetings, are quite similar. Both were in the same locale, involved the same individuals, namely Genovese and Carmine Polizzano, and took place in the late Spring or early Summer of 1956. Cantellops' trial testimony was that at one of the alleged meetings, when he approached Genovese and Carmine Polizzano, who were engaged in conversation, he was shooed away and was later told by Polizzano "never to interfere when he [Polizzano] was talking to the 'right man'"; however, on the other alleged Fourth Street occasion Cantellops' testimony was limited to his observation of these two individuals engaged in conversation. Hence, if there was in fact but one such occasion it is not clear as to whether it was the former or the latter.

True, the Court in summarizing the evidence in its charge to the jury alluded to Cantellops' testimony concerning two occasions when he saw Genovese in conversation with Carmine Polizzano. There was no objection to this portion of the charge by movants. The Court was careful to instruct the jury as follows:

"If, during the course of the trial or these instructions, I have made reference to the testimony of a witness which may not be in accord with your recollection, you are to disregard such a statement by me. I want to make that as strong as I can. It is your recollection of the evidence and your recollection alone that governs.

" * * * it is your recollection that is final, conclusive and controlling."

* * *

"If the Court said anything in its summary that does not conform exactly and completely with your recollection, disregard what the Court said and rely upon your recollection."

Moreover, during the course of the jury's deliberations, it requested that there be read to it "the cross-examination by * * * [then counsel for Genovese] of the witness Mr. Nelson Cantellops." The Court granted this request and the jury heard the minutes of such cross-examination including the question and answer quoted above to the effect that on his direct examination Cantellops testified that he had seen Genovese *once or twice* in the late spring or early summer of 1956.

The Court is satisfied that the alleged discrepancy was before the jury. Indeed, it was the very last thing on this subject that the jury heard.

Under the circumstances and being bound by the principle that the Court must be "reasonably well satisfied" that the trial testimony was false,[8] the Court cannot properly grant a new trial based on this alleged inconsistency.

The government also argues that even assuming arguendo the falsity of the trial testimony as to the number of times Cantellops observed Genovese on Fourth Street in conversation with Carmine Polizzano, the second Larrison prerequisite—that without such false testimony the jury might have reached a different conclusion—is also not satisfied.

To test the government's contention it would be appropriate to summarize in brief the trial testimony concerning the movant Genovese. The testimony of the witness Cantellops is to the effect that in addition to the Fourth Street meeting or meetings (depending upon which version is accepted) there was also the following:

(a) Genovese was present at a meeting on East 86th Street, spoke to John Ormento, one of the alleged conspirators, and after leaving Genovese, Ormento

8. United States v. Troche, 2 Cir., 1954, 213 F.2d 401.

stated to Cantellops "Let's go. The right man wants to take a look at you to see if you are all right." [9]

(b) At the end of August or early September 1956 Cantellops drove to a restaurant on East 86th Street with certain of the conspirators and after one of them, Ormento, made a telephone call all drove to the West Side Highway where they had a rendezvous with another car. Cantellops and Ormento entered the other car in which Genovese and Giganti were sitting. Ormento introduced Genovese to Cantellops as "the right man" and Genovese told Cantellops that they "were going to a meeting where territorial control was to be discussed." Ormento also told Genovese that Cantellops had done "a good job for us" which is significant because Cantellops' sole dealings with Ormento were in the narcotics traffic.

(c) The car continued to the defendant Mazzie's house at which a meeting was held among certain of the conspirators. At the outset Genovese and Giganti stayed outside and thereafter Genovese came in. The testimony indicates that Genovese was aware that the conference concerned territorial control of narcotics distribution in a certain area of the East Bronx and that when he came into the meeting "everybody spoke his part and the time and details" and Genovese "wanted to know when to send his men in."

(d) The trial testimony contains other references to the "right man". At a meeting in November 1955 at which certain of the conspirators discussed narcotics distribution it was indicated that the right man's approval would have to be obtained. When Giganti drove Cantellops to Ohio for the purpose of making a delivery of narcotics, Giganti inquired whether Cantellops knew the right man and stated that he would try to make arrangements for Cantellops to meet the right men.

As the Court of Appeals stated, in reviewing the sufficiency of the evidence against Genovese:

"We find upon all the evidence that there is ample proof of Genovese's participation in the conspiracy as one of its principal directing heads". 274 F.2d at page 188.

In the light of the abundant evidence of Genovese's "participation in the conspiracy as one of its principal directing heads" and the minor alleged discrepancy as to whether there were one or two meetings on East Fourth Street, which discrepancy was before the petit jury, the Court cannot find that the jury "might have" reached a different result had the Fourth Street testimony, as it unfolded at this hearing, rather than as it unfolded at the trial, been before the jury.

Alleged new evidence of perjury with respect to aspects of trial testimony.

At the trial, Cantellops testified about a trip to Las Vegas in March of 1955, which was the first of a series of out-of-town trips in furtherance of the conspiracy. After conferences with certain of the conspirators, Cantellops agreed to transport narcotics to Las Vegas for $1,000. At the airport bus, while the movant Barcellona was talking to Cantellops, an unidentified man handed Cantellops a package which he took to Las Vegas. In Las Vegas, Carmine Polizzano met Cantellops and introduced him to the defendant Fiano, to whom Cantellops gave the package.[10]

Petitioners direct themselves, not to the essential aspects of the Las Vegas trip, but rather to Cantellops' trial testimony concerning the identity of the person with whom he traveled on his return from Las Vegas to New York. Cantellops' trial testimony was that he shared expenses with an unidentified "guy who was broke and we drove together back to

9. As the trial testimony indicates Genovese was known to the witness as the "right man".

10. It is to be noted that the petit jury acquitted Fiano of the crime of which the movants herein were convicted.

New York." At the hearing, however, Cantellops admitted that he returned from Las Vegas with Jose Linares and Dominick Stella (describing them as a pusher and gunman respectively for the "syndicate") and that he had known Linares prior to that trip. Both Stella and Linares corroborated the fact that they returned from Las Vegas with Cantellops at the time in question.

In addition, Linares testified that he and Cantellops were arrested early in March 1955, for conspiring to defraud a jeweler in that they attempted to pass off a zircon as a diamond. Bail, fixed at $500 for each of the alleged conspirators, was posted by a bondsman who accepted as security the undertaking of Orlando Seda, Carlos Rodriguez and Rene Ramirez, who were friends of Linares. When Cantellops did not appear in Court on March 18th as required, Linares allegedly determined to find him to protect the bail his friends had posted and also because Linares thought Cantellops could exonerate him. Linares testified that he paid $100 to the superintendent of the building in which Cantellops' girl friend lived to induce him to intercept her mail and deliver it to him. This allegedly enabled Linares to locate Cantellops who was in Las Vegas. Linares, offering to bear the expense of the trip to Las Vegas, persuaded his friend, Dominick Stella, to come along. They drove to Las Vegas, located Cantellops there, and the next morning the three of them left for New York.

Cantellops testified that the Stella and Linares trip to Las Vegas was related to syndicate business rather than to the "matter of diamonds." Continuing, Cantellops testified that Linares came to "advise" him to go back to New York, that "the people that sent me [Cantellops] there didn't want me to stay any more" and "that is why he [Linares] got to take a gunman with him" to accomplish the mission. Cantellops also testified that he was prepared to come back to New York himself because he did not want to stay in Las Vegas.

Apart from Cantellops' testimony about their connection with the "syndicate", other evidence in the record shows that Stella and Linares are not strangers to the narcotics traffic. Stella is presently serving a term in Clinton State Prison for possession of eight ounces of heroin. According to the witness Seda who had known Linares for some months prior to his Las Vegas trip, Seda was arrested in Linares' apartment, where eight ounces of heroin were found, and was subsequently convicted for possessing narcotics on that occasion.

As noted at the outset the Berry rule is generally applicable to a motion for a new trial based upon newly discovered evidence. It is only in those situations where there is a recantation or where the trial testimony is false that the less rigid Larrison test is applied.

The only demonstrably false trial testimony of Cantellops with respect to the Las Vegas trip touches upon the identity of the individual with whom he returned. Hence, the Court must determine whether the jury might have reached a different conclusion if Cantellops had testified at the trial that he returned from Las Vegas with Stella and Linares. The Court is satisfied that the falsity of Cantellops' trial testimony concerning the identity of his companion on the return trip does not bear upon the material issues at the trial and would merely constitute cumulative evidence of falsification going only to the witness' credibility. Not only had Cantellops' credibility been the subject of searching scrutiny by able defense counsel at the trial, but counsel had also specifically drawn the trial jury's attention to Cantellops' vagueness concerning his alleged traveling companion and Cantellops' Grand Jury perjuries on material matters. It can hardly be said that the naming by Cantellops at the trial of Stella and Linares as his traveling companions "might have" produced a different result.

Counsel for the movants, however, urge that the Court should not limit

itself as to whether the correct naming of traveling companions in and of itself, might have produced a different result. They argue that the Court should also consider the other evidence which might have been produced at the trial had Cantellops' traveling companions been named as Stella and Linares. Then they argue that the jury might have concluded that Cantellops' purpose in going to Las Vegas was in connection with the so-called diamond affair and not to further the activities of the conspiracy.

Even assuming arguendo the correctness of movants' contention that the Larrison test applies to the Stella and Linares testimony bearing on Cantellops' purpose in making the trip, [11] first, the Court is not "reasonably well satisfied" that Cantellops' trial testimony on the subject was false and, indeed, the Court finds unworthy of belief the indirect evidence given by Linares and Stella which movants assert as tending to show that Cantellops' trip to Las Vegas was for a purpose other than to deliver narcotics in furtherance of the conspiracy charged. Based upon the Court's observation of the demeanor of Linares and Stella on the stand, the evidence bearing on their testimonial reliability [12] and their dubious account of the circumstances surrounding the Las Vegas trip, [13] to accept their version of the facts places too great a strain upon credulity. Secondly, movants in urging that the second (or "might have") prerequisite under the Larrison rule is met, point out the Linares and Stella testimony as to the purpose of their trip to Las Vegas. Movants overlook, however, that had such testimony been adduced at the trial there would

also have been adduced the other competent evidence concerning their respective backgrounds and credibility as well as Cantellops' testimony, adduced here, to the effect that Stella and Linares were acting in furtherance of the conspiracy. Also, the indirect evidence relied upon by petitioners shows, at best, that Cantellops may have sought to avoid criminal prosecution [14] for the "diamond affair." It does not exclude the direct evidence of purpose testified to by Cantellops at the trial and on these hearings. Cf. Fiorito v. United States, 9 Cir., 1958, 265 F.2d 658. Indeed, Cantellops could have had many purposes in venturing to Las Vegas.

Hence, there are two criteria under the Larrison test which are not met in connection with this "newly-discovered evidence." The Court can hardly conclude (i) that it is "reasonably well satisfied" that Cantellops' trial testimony was false, except of course, for the fact that he returned from Las Vegas with Linares and Stella; and (ii) that the jury might have reached a different result if their testimony and Cantellops' testimony (all of it, both favorable and unfavorable to petitioners) had been adduced at the trial as it was on this hearing. On the contrary, reason and experience would dictate that this testimony had it been before the jury would have tended to relate Cantellops closer to the conspiracy and rendered his entire testimony the more believable.

Alleged suppression of rent record.

Petitioners also contend that at the time of the trial the United States Attorney was in possession of a certain rent

---

11. The Government disputes this contention stating that the Berry rule should be applied to this "newly-discovered" evidence.

12. Stella was convicted in 1932 of robbery in the third degree; in 1935 of robbery or attempted robbery (the witness not being able to recall which) and the narcotics crime referred to above and has had parole violations. Stella was also recently released from an institu-

tion for the criminally insane. Linares was convicted in 1955 of possessing a firearm and of robbery.

13. The testimony of Linares and Stella is contradictory with respect to certain aspects of their Las Vegas trip.

14. Actually, Cantellops was not a "fugitive" at the time of his Las Vegas trip. The charge, a misdemeanor, was pending in the Court of Special Sessions of the City of New York.

**550**

record issued by the proprietor of the premises at which Cantellops stayed while he was in Las Vegas in 1955. The record is hardly a model of clarity and indeed is susceptible of several interpretations, ranging from a possible rent payment period of two weeks to a period of one week. Movants urge the Court that Cantellops' testimony at the trial indicates that he had stayed in the Las Vegas rooming house for a period of some three to four days. Movants overlook other portions of the trial minutes which indicate that Cantellops' testimony concerning the duration of his stay was not always referred to as being of that duration, for example, when Cantellops was asked whether he was actually in Las Vegas for more than five or six days and in fact closer to two weeks, his response was "that could be." Other portions of the record indicate that Cantellops testified that he was in Las Vegas for five days more or less. It must have been clear to the jury that Cantellops' testimony concerning the duration of his stay in Las Vegas was but an approximation. To seize upon one isolated portion of the record would be contrary to settled rules and the Court's explicit admonition to the jury that it must consider all the evidence. These variations in the duration of his Las Vegas stay were amply pointed up by defense counsel during the lengthy and grueling cross-examination of Cantellops which also exposed him to the jury as less than a model citizen.

As a matter of fact defense counsel's inquiry of Cantellops at the trial about a total stay of two weeks in Las Vegas was prompted by the report which was turned over to defense counsel to the effect that Cantellops had told Agent Consoli that he had worked in Las Vegas about two weeks.

The contention of the movants that they were seriously prejudiced by the government's failure to come forward with a rent record which in movants' view would indicate a two weeks stay in Las Vegas, is not persuasive in the light of the fact that there was turned over to movants and used by them at the trial

portions of a report by Agent Consoli imparting intelligence of like tenor.

■ Under all the circumstances the Court cannot find any discrepancy between an ambiguous rent record and Cantellops' trial testimony which was equally imprecise nor charge the government with a lack of good faith for having failed to turn over a rent record which at best would have indicated a stay of two weeks, where the very same government turned over Agent Consoli's report of similar effect.

Mrs. Latham, the proprietress of the rooming house at which Nelson Cantellops stayed in Las Vegas, testified at this hearing that the rent record for Cantellops covered a period of two weeks. However, the report made by Agent Mulgannon in March of 1958 (Defendants' Exhibit R) about his interview of Mrs. Latham in Las Vegas indicated that her interpretation then of the rent record was to the effect that Cantellops stayed at her rooming house for approximately one week. Mrs. Latham's alleged independent recollection at this hearing as to the duration of Cantellops' stay cannot be accepted.

Of course, this Court would not tolerate any suppression by the government of evidence showing that a trial witness perjured himself. Such conduct would constitute a violation of the due process clause of the Constitution, Amend. 14 [see Napue v. People of State of Illinois, 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217] not to mention our high standards for the conduct of Federal prosecutors in criminal proceedings. See Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314. United States v. Zborowski, 2 Cir., 1959, 271 F.2d 661. These principles, however, have no application to the omission of the United States Attorney to produce Mrs. Latham's rent record. The government's bona fides at the time of the trial must be measured not by the tenor of certain portions of Mrs. Latham's 1961 testimony as to the 1955 events, but rather by the United States Attorney's knowledge at the time of trial. The government had

in its possession at the time of trial Agent Mulgannon's report which revealed Mrs. Latham's then view that the rent record showed Cantellops stayed at her establishment for a period of about one week. This report also stated that she inaccurately described Cantellops as apparently of Italian extraction, speaking good English, without an accent. In April of 1956, Mrs. Latham was unable to identify a photograph of the witness Cantellops. As indicated, Cantellops' trial testimony as to the exact duration of his stay was imprecise and consistent with Mrs. Latham's then recollection and interpretation of her records.

We cannot concur in the suggestion that the movants are entitled to a new trial on the basis of the government's omission to produce the rent record at the trial because *inter alia:*

(i) Cantellops' testimony throughout his examination was imprecise as to the duration of his stay, and, as the jury well knew, his estimates as to such duration varied as indicated.

(ii) At the time of trial the government's knowledge of Mrs. Latham's interpretation of the rent record was consistent with Cantellops' trial testimony.

(iii) The government turned over to movants' counsel Agent Consoli's report containing the statement ascribed to Cantellops about having worked in Las Vegas for approximately two weeks.

(iv) The rent record or a copy thereof could have been obtained by movants' trial counsel who were able to unearth and use at the trial many items about Cantellops, some of doubtful relevance.

(v) The rent record was itself ambiguous and open to varying interpretations.

(vi) Based upon the Court's opportunity to observe the demeanor of the witness Latham at these hearings, the testimony bearing on her credibility and the closer proximity in point of time of the 1955 events to her statement to Agent Mulgannon, the Court cannot rationally accept her improved recollection at these hearings, especially in view of the attentions shown her and Mr. Latham while they were in New York from January 3rd to January 24, 1961 waiting to testify here.[14a]

Apart from the movants' contention, already considered, concerning the government's omission to produce the rent record at the trial, the evidence and testimony adduced at these hearings as to the duration of Cantellops stay in Las Vegas, is not such that the Court can be "reasonably well satisfied" that Cantellops' trial testimony on this point was false.[15]

### Certain post-trial perjuries allegedly totally discrediting Cantellops' trial testimony.

Petitioners claim that certain allegedly false testimony given by Cantellops after the trial entitles them to a new trial under the decision in Mesarosh v. United States, 1956, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1. There the Court held that a new trial was required where a principal government witness had given demonstrably false testimony subsequent to the trial under circumstances which so discredited the witness as to make his original trial testimony unreliable.

The alleged post-trial perjuries of the witness Cantellops are not germane to the material issues presented at the trial.[16]

The Mesarosh case involved an appeal from a judgment of conviction where the

---

14a. The Lathams' bills at the Hotel Shelburne for restaurant, telephone and cash paid out aggregated $569.99 (this figure inclusive of $56.13 for flowers but exclusive of room charges), and were charged to counsel for one of the movants. Mr. Latham did not testify at the hearing.

15. It should also be noted at this point that the evidence adduced at the hearing does not persuade the Court that Cantellops falsified at the trial with respect to his financial condition in Las Vegas.

16. The post-trial perjuries were allegedly:
 (1) Cantellops' testimony before a Grand Jury with respect to the amount of the bribe he allegedly received for his recantation which differs from his testimony as to that amount on this hearing.
 (2) Cantellops' testimony that he vol-

principal government witness made perjurious post-trial statements which were material to the trial issues and, so far as appears, the witness' credibility was unimpeached before the jury. The essence of the Mesarosh opinion is that the post-trial perjury was so pervasive and so germane to the issues at the trial, as to totally discredit the witness. However, in the case at bar the post-trial perjuries relate to either peripheral or immaterial matters. Moreover, the witness Cantellops' lack of credibility was urged before the jury by defense counsel throughout the fourteen days of his cross-examination and in their summation which consumed approximately one week. As the Court of Appeals stated, "The jury was fully advised of how Cantellops told his story to government agents and the United States Attorney, of his several appearances before the Grand Jury and the changes and modifications in his testimony there." 274 F.2d at page 190. In its charge to the jury, the Court noted that Cantellops "has an extensive criminal record ranging from attempted forgery to possession of narcotics and has, from all indications, to put it mildly, led less than an exemplary life". Continuing, the Court instructed that "his testimony * * * should be viewed with great caution and scrutinized carefully" and charged *falsus in uno, falsus in omnibus.*

It should also be noted that the Supreme Court in the Mesarosh case, expressly stated:

"* * * we are not dealing here with a motion for a new trial * * * under Rule 33 of the Federal Rules of Criminal Procedure, * * * presenting untruthful statements by a Government witness subsequent to trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is 'merely cumulative or impeaching' is not, according to the often-repeated statement of the courts, an adequate basis for the granting of a new trial." 352 U.S. at page 10, 77 S.Ct. at page 5.

Not only does the Mesarosh case expressly recognize that untruthful post-trial statements are not ordinarily the basis for a new trial but that case, so far as appears, involves false post-trial statements of such a character as to totally discredit a witness whose credibility before the jury was not attacked.

Accordingly, the Court is of the view that the Mesarosh case is inapposite to the case at bar.

### Spoliation of Government Agents' notes.

Petitioners advance still another ground in support of their applications for a new trial, viz. that the Government's failure to produce or satisfactorily account for the notes of certain Government agents which "may" contain substantially verbatim statements of a government witness, constitutes a violation of movants' rights under the so-called Jencks Act, 18 U.S.C.A. § 3500. The Government agents whose notes are involved are Federal Bureau of Narcotics Agents Rowan, Consoli and Muglia and Assistant United States Attorney Shaw:

In May or June of 1957 Assistant United States Attorney Shaw began to develop the case which culminated in the conspiracy indictment under which these movants were convicted. Agents Rowan

---

untarily contacted government officials to apprise them of his post-trial recantations, which testimony was contradicted by representatives of the government.

(3) Cantellops' sworn statement to the government to the effect that all of his trial testimony was true. In this connection the only demonstrably false aspect of such statement was as to the names of the individuals with whom he returned from Las Vegas as previously noted.

(4) The alleged sworn statement by Cantellops at the Mount Carmel Church which has already been discussed.

(5) The alleged discrepancy in the number of times that Cantellops had seen Genovese on East 4th Street with Carmine Polizzano, which was also previously noted.

and Consoli of the Federal Bureau of Narcotics Enforcement Squad were assigned to assist Shaw and they operated under his supervision and control. In the Spring of 1956 the case was transferred from Shaw to Assistant United States Attorney Walsh. Rowan and Consoli were transferred from the Enforcement Squad to the Special Squad at the United States Attorney's Office, which consisted of them and three of their brother agents including Nuglia. The notes here involved were allegedly made during the investigatory stages of the case prior to the filing of the indictment on July 7, 1958.

## A. Rowan.

William A. Rowan testified that while he was employed as an agent of the Federal Bureau of Narcotics,[17] he participated in the investigation and preparation of this case; that on numerous occasions during 1957 and 1958 he either interviewed or was present at interviews with Nelson Cantellops concerning this case; and that at most of these interviews he took handwritten notes of Cantellops' statements. Although Rowan claims to be the initiator of, and a key participant in, the investigation and preparation of this case, Donald Shaw, the Assistant United States Attorney in charge of the case from its inception until its transfer to William Walsh, testified that Rowan's principal duty was to act as a "chaperone" for witnesses and, on a few occasions, to do investigative work. Rowan was unable to specify the number of occasions on which he interviewed Cantellops but Shaw testified that Rowan interviewed Cantellops on but five or six occasions in 1957 and that these interviews took place in a room across from Shaw's office which Shaw had "direct vision of, and * * * would visit * * * from time to time during these occasions." Rowan initially testified that it was his practice to prepare a typewritten transcription of his notes within a week or so after an interview. He subsequently testified that it was not until the early part of 1958 that he transcribed into typewritten form all the longhand notes he had taken during 1957, but that all notes taken by him in 1958 were similarly transcribed within one or two days after an interview. Rowan admitted that the typewritten transcriptions of his handwritten notes were coherent, chronological refinements of the longhand notes rather than precise transcriptions thereof, but claimed that the typewritten transcriptions "were both read and he [Cantellops] read them".

Rowan testified that from time to time as the investigation of the case progressed, he informed his superiors at the Bureau of Narcotics of Cantellops' statements and that on a number of occasions he was told to prepare written memoranda containing the intelligence which he had verbally communicated to them. Rowan claims to have responded with the explanation that if he did make a written report it might become available to the defendants at the trial of the case and that his superiors told him to continue to "do what you think is best" or approved of his practice of not making reports.[18] Rowan further testified that when the investigation was transferred in March or April of 1958 from the Bureau of Narcotics' Enforcement Squad to the Special Squad attached to the United States Attorney's Office, Agent Enright, the Squad leader, asked him why the file did not contain more memorandum reports. Rowan allegedly explained that if he had made reports they were likely to become available to defense counsel at the trial, and that Enright approved of this practice of not making reports.[19]

17. As appears hereinafter, Rowan is no longer employed by the Federal Government.

18. The fact is that Rowan prepared certain reports, portions of which were turned over to defense counsel at the trial.

19. Apparently, Rowan's alleged concern about material becoming available to movants did not cause him to refrain from making the longhand notes or typewritten transcriptions he claims to have made. The distinction between handwritten notes and typed transcriptions, on the one

Rowan stated that at or about the time of the filing of the indictment in this case, he destroyed both the handwritten notes and typewritten transcriptions in the presence of other narcotics agents, whom he thought were aware of his alleged purpose of frustrating production under the Jencks Act.

In view of the serious nature of Rowan's testimony, the Court did not and does not now stop to consider any claim of movants' alleged lack of diligence at the trial.[19a] The Court reiterates what it said at the hearing:

"* * * the Court is not concerned so much with procedural limitations when it comes to so serious an attack upon the administration of justice that records were suppressed and destroyed, so that the rights of citizens were prejudiced."

\* \* \* \* \* \*

"Do you understand why, * * * I was so offended by the possibility that records had been destroyed that should have been turned over and the intimation having been made that it was done deliberately with a view toward avoiding the effects of the Jencks decision and the so-called Jencks statute, that I felt that it was my responsibility to pursue it."

Rowan's version of his conversations with his superiors about his failure to submit reports and his ideas of circumventing Jencks principles are unequivocally contradicted by each of them. His equivocal testimony as to the destruction of his notes and typed transcriptions in

the presence or with the assistance or knowledge of his co-agents was denied by each of them. Rowan testified that he had discussed circumventing the Jencks rules with other agents of the Special Squad whose identity he did not recall. Once again, the testimony of his brother agents was to the contrary.

The evidence indicates that circulars from the Federal Bureau of Narcotics provided for compliance with Jencks principles. The practice of preparing reports continued after the Jencks case and statute and, indeed, additional emphasis was placed upon accuracy, factual material and elimination of hearsay.

Rowan admitted that he had worked on many other cases prior to the Jencks decision, Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (rendered on June 3, 1957) and the Jencks statute (enacted September 2, 1957), and that he always destroyed his notes even prior to the promulgation of the Jencks case and statute. His testimony that he destroyed the notes at or about the time the indictment was returned in order to evade Jencks principles does not stand up because even if he had typed his notes some six months earlier, as he testified,[20] he could have destroyed the notes far sooner if his primary concern was with effectively evading the Jencks rules.

Rowan was employed by the Federal Bureau of Narcotics from October of 1956 to August of 1960, except for five months during 1958 when he was employed by the New York State Commission of Investigations. Rowan's resignation

---

hand, and reports, on the other, is difficult to comprehend.

19a. At a voir dire hearing conducted during the course of the trial, Rowan testified that "I had been making notes all along while speaking with the witness" and that "I had notes on a vast amount of information that he had given me". Rowan also testified that the notes were not then in existence. The Court declined to inquire, as suggested by defense counsel, whether the notes were destroyed. Movants did not raise this issue on appeal.

20. Rowan's testimony as to the time when he transcribed into typewritten form his handwritten notes of the interviews varies from that above indicated to a day or two after each interview to about a week or so after interviews. Similarly, his testimony surrounding the destruction of the notes varies from having destroyed them on two or three occasions to having destroyed them on one occasion and it also vacillates insofar as it names other co-agents as having been present at the time or having assisted in the destruction. Rowan's brother agents have testified to the contrary.

from the latter agency was requested for an undisclosed reason. His resignation from the Federal Bureau of Narcotics in 1960 was requested by Mr. George Gaffney, the District Supervisor, when it was discovered that Rowan first failed to report and then falsely reported the circumstances under which a Bureau car driven by him was damaged. Thereafter, Rowan accused Gaffney of having ruined his life.

Evidence adduced at these hearings indicates that Rowan was to derive compensation for "time lost" during the course of his testimony here. Prior to testifying, Rowan was told by an associate of counsel for one of the movants that he would be compensated "for his time lost". Rowan replied that he had no way of calculating the value of his "time lost", stating that on one day he had earned $1,200 in commissions. Rowan knew that on no day had he actually earned $1,200 or any sum like that.

All this takes on new meaning in view of Rowan's continuing indebtedness and his desperate financial plight.[20a] After his forced resignation in August of 1960 from the Federal Bureau of Narcotics and prior to his testimony here, he repaid certain of his debts. During this period of time he borrowed $800 from a friend, no part of which was used to satisfy his obligations. Not only was there the promise of present reward but the prospect of future benefit. Counsel for one of the movants testified that an old friend of his was a partner in the brokerage firm employing Rowan and that this friend put him in touch with Rowan so that counsel could speak with him about this hearing. Rowan testified that when he expressed concern about being excused from work to testify here, said counsel told him he would contact the partner he knew in case there was any

trouble about Rowan's being able to attend.

His conduct at these hearings indicates that Rowan is emotionally unstable and testimonially unreliable. Indeed, he differed with movant's counsel with respect to what transpired during conversations between them prior to his testimony at the instant hearings.

■ Having observed Rowan's demeanor on the witness stand and having heard his vacillating and self contradictory testimony, and in view of his obvious bias and ill will towards the Federal Bureau of Narcotics and his superiors, his pecuniary interest in testifying here and the credible evidence presented at these hearings, the Court finds Rowan's testimony as to his purpose at the time he destroyed the alleged notes, if in fact there were notes of the character claimed by him, unworthy of belief. A far more plausible explanation of his destruction of such notes as he may have had is simply that after having no further need for them, he destroyed them in accordance with his invariable practice.

■ Petitioners contend that the government's failure to have produced or satisfactorily accounted for these notes constitutes a Jencks Act violation sufficient to entitle them to a new trial. It will be noted that in the recent case of Campbell v. United States, 1961, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428, the Supreme Court left open the question as to whether destruction for improper motives or in bad faith should be regarded as the equivalent of non-compliance with an order to produce or whether any destruction without regard to the circumstances should be so regarded. § 3500, by its very terms, refers to a "statement * * * of the witness *in the possession of the United States.*"

---

**20a.** He testified that he had borrowed sums from his brother agents, $20 from a Bureau of Narcotics informer and $1,800 from two finance companies, upon applications which contained false financial information. Moreover, counsel for one of the movants testified that Rowan told him he did not have enough funds to return to his home in Binghamton, New York, at the conclusion of his testimony here.

**556**

(Emphasis added.) In the Court's view, it was not the intention of the Congress in enacting § 3500 to require the government to retain in its files ad infinitum, with penalizing consequences for the failure so to do, the numerous notes taken during untold interviews in connection with the investigation of countless criminal matters. See S.Rep. No. 981, 85th Cong., 1st Sess., in 2 U.S.Code Cong. & Admin.News, p. 1864 (1957). This is not to state or imply that the government may with impunity and for improper ends destroy notes in an attempt to deprive criminal defendants of that which the Congress has seen fit to grant them. The Court holds that the good faith destruction of notes not within the ambit of the Jencks statute is not the equivalent of non-compliance with an order to produce.

But even if any destruction without regard to motives or bona fides should be deemed the equivalent of such noncompliance, if allegedly destroyed notes were not "statements" under the Jencks Act, there could be no claim of noncompliance for there would be no entitlement under § 3500. Indeed, the Supreme Court has recognized that "the Government will not produce documents clearly beyond the reach of the statute." Palermo v. United States, 1959, 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287. Hence, our inquiry here is whether such scanty memoranda, if any, as Rowan may have made, fell within the definition of the term "statement" within the purview of § 3500.

"Statement" as used in § 3500, is first said to mean a written statement made by the witness and signed or otherwise adopted and approved by him. Rowan testified that on some occasions he read to Cantellops the typewritten transcriptions and on other occasions he asked Cantellops to read them. Although Rowan admitted that he was never alone with Cantellops his colleagues deny ever having seen a typed document read to or by Cantellops and, for that matter, cast doubt upon the existence of typed transcriptions in anything like the volume

described by Rowan. He admitted that he did not read each and every word of the alleged typed transcriptions to Cantellops but only portions requiring clarification. He also testified that he typed up his notes during his interviews with the witness. The room which was available to him for such interviews did not have a typewriter and neither Shaw nor his co-agents saw him typing under the circumstances testified to by him. Based upon the credible evidence adduced at these hearings, the Court's observation of the witness Rowan, his untrustworthy and vacillating testimony here, and the evidence before it, the Court finds that no writing embodying Rowan's alleged notes of interviews with the witness Cantellops was adopted or otherwise approved by Cantellops within the meaning of § 3500.

"Statements", within the purview of the Act also include stenographic or other modern reporting methods producing a verbatim version of the witness' statement. There is no claim or any basis for a claim that there was such a verbatim "statement" made by the witness Cantellops during the course of any interview at which Rowan was present.

Lastly, the statute includes "a substantially verbatim recital of an oral statement" made by a witness to a government agent "and recorded contemporaneously with the making of such oral statement." In treating with this latter category of "statement", the Supreme Court stated "it is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent." Palermo v. United States, supra, 360 U.S. at page 352, 79 S.Ct. at page 1224.

On direct examination by counsel for movants, Rowan testified that he eventually accumulated a three-inch high sheaf of handwritten notes and about half as much typewritten material. Neither

Rowan's colleagues nor superiors, saw a sheaf of notes such as that described by Rowan.

Shaw testified that Rowan's handwritten notes were "about a tenth as voluminous" as his,[21] "in other words, they formed a very small fragment, probably even less than that." Shaw further testified that he had never seen more than five or six pages of typewritten notes by Rowan and that toward the end of the first quarter in 1958, when Shaw was preparing a chronological statement of the case, all that he received from Rowan were these five or six typewritten pages, which were so cursory and generalized that he could not utilize them in preparing the chronological statement.

Rowan admitted that it was "impossible" for him to keep up with Cantellops' statements in his note taking and further, that it would be fair to state that he jotted down as best he could what Cantellops was saying as he spoke. He admitted that his notes were not verbatim but rather abbreviated since Cantellops spoke rapidly, in bad English, ungrammatically and indistinctly.

Also significant is that Rowan's role in the case was to assist Shaw and that the only material which Shaw received from Rowan at the time Shaw was preparing the chronological, were some five pages of cursory generalized material which was of no assistance to Shaw. Since Rowan could reasonably have been expected to turn over that which he had to his superior and since what he turned over could hardly qualify as a "substantially verbatim" recital, it does not appear that Rowan had in his possession "statements" falling within the last category under § 3500.

 Under all the circumstances and with due regard for the number and duration of the interviews Rowan allegedly had with the witness, the quantum of his alleged notes, his admitted laxity in typing and filing daily and monthly reports, the manner in which Cantellops speaks with which the Court is quite familiar having been present throughout his extensive testimony at the trial and at these hearings, and the Court's opinion as to Rowan's utter lack of veracity and regard for the testimonial oath, the Court concludes that such notes as may have been taken by Rowan, whether handwritten or typed, could hardly have been substantially verbatim recitals within the meaning of § 3500. See Palermo v. United States, supra, 360 U.S. at page 352, 79 S.Ct. at page 1224; United States v. McKeever, 2 Cir., 1959, 271 F.2d 669, 674–675.

In sum, the testimony of Rowan is unreliable to the last degree.

### B. Muglia.

 Agent Muglia prepared a report under date of April 22, 1958. At the trial, under voir dire examination, Agent Muglia testified that Cantellops did not give him the information contained in the April 22, 1958 report. Since the report was therefore not within 18 U.S.C.A. § 3500, it was not turned over to defense counsel. Since at the hearing on these motions, Agent Muglia did not recall from whom he got the information in the report, movants argue that Agent Muglia lied at the trial when he stated that the information did not come from Cantellops. This is a *non sequitur*. The recent failure to recall is not in the least inconsistent with trial testimony given in closer proximity to the event. Muglia's testimony at the hearing was that he could not recall the source of the information. Movants' contention that the information, if not from Cantellops, must have come from Rowan is not warranted by the testimony. In any case, the Rowan interviews have already been considered.

### C. Consoli.

 Agent Consoli, a member of the Enforcement and Special Squads, took notes during interviews with the witness Cantellops. These interviews were to be the subject of memorandum reports

---

21. Shaw testified that his notes were about an inch to an inch and a half thick.

which Consoli planned to and did write. His unimpeached testimony is to the effect that the contents of the notes were incorporated in a memorandum report and thereafter the notes were destroyed. These notes, however, were not verbatim but were handwritten accounts of selected portions of the interviews and hence, not "statements" within the Jencks statute. There is no suggestion nor any basis for a suggestion that Consoli's handwritten notes which were used in the preparation of his reports were destroyed in bad faith or with the intention to circumvent the Jencks case or statute. In any case, the relevant portions of Consoli's memorandum reports were made available to movants at the trial in the exercise of the Court's discretion.

### D. Shaw.

■ Assistant United States Attorney Donald Shaw was initially in charge of the preparation of this case and was the principal interviewer of Nelson Cantellops. His testimony is that he had some twenty to thirty interviews with the witness Cantellops and that he took notes at these interviews. According to Shaw's testimony his original notes of the interview were not substantially verbatim accounts. Shaw explained that he was unable to make a substantially verbatim account of Cantellops' statements owing to the witness' poor English and fast speech. When the case was transferred from Shaw to Walsh in the Spring

of 1956, the chronological summary which Shaw had prepared, along with his original notes of the interviews, were also transferred. The record is silent as to what became of them. The Shaw papers are the only challenged writings by government agents which may be in existence and which the Court has not yet examined.

Consistent with the rulings of the Court during the trial to the effect that it was desirous of inspecting material in respect of which a question under the Jencks Act was involved, the Court will, on notice to all counsel, fix a date for a voir dire examination with respect to the Shaw papers referred to above.

### E. Generally.

■ The legislative history of § 3500 demonstrates that the Congress intended to protect the files of the government against unwarranted disclosure [22] and at the same time to make available to criminal defendants for cross-examination of government witnesses' statements containing recitals substantially in the words of the witness or actually adopted by him. The Court is satisfied (except as to the Shaw papers which will be the subject of a voir dire examination as aforesaid) that all "statements" to which these movants were entitled under § 3500 were received by them and indeed, the record demonstrates that the Court was exceedingly generous even to the point of going beyond the mere letter of the Jencks Act.[23]

22. Apart from the reasonable explanation concerning the good faith destruction of handwritten notes of interviews after their purpose was served and their contents incorporated in more formal reports, the Government points out that security considerations require minimizing the number of confidential reports in existence covering the same subject matter. Indeed, at the trial the Court's attention was called to a situation where portions of Federal Bureau of Narcotics reports turned up in unauthorized hands.

23. There was furnished to defense counsel at the trial the following:

1. 312 pages of Cantellops' Grand Jury testimony.

2. Two of the witness' question and answer statements dated October 10, 1957 and January 16, 1958, respectively.

3. All United States Marshal's receipts, indicating the witness' visits to the United States Court House.

4. The Veterans Administration Medical records regarding Cantellops and Rikers Island Medical records when the witness was incarcerated there in 1950 and 1953.

5. Portions of numerous reports of narcotic agents.

Although not every contention of the movants or of the Government is discussed the Court has not overlooked any arguments however specious. For the most part, the instant applications are an attempt to attack the credibility of Nelson Cantellops, the principal Government witness at the trial, on the basis of allegedly- "newly discovered items of evidence" (many of them known at the trial) which neither individually nor collectively are significant when viewed in the light of the most searching and grueling cross-examination. At the trial these movants were represented by able and experienced counsel who left no stone unturned and each movant had the benefit of the objections made by the others.[24] Subject only to the voir dire to be held with respect to the Shaw papers, the Court is satisfied. that the petit jury heard and weighed all the testimony of the witness Cantellops after having been fully and clearly apprised of the many factors bearing on his credibility, ranging from criminal convictions and complicity in the crime charged to marital infidelities and other transgressions. The jury chose to believe him as to these petitioners. As the Court of Appeals said

"It was for the jury to judge the witness Cantellops on the basis of all that was brought out about his character, his previous activities, his statements to the government, testimony before the Grand Jury and before the petit jury." 274 F.2d at page 190.

The Court will fix a date for a voir dire examination as indicated above.

To the extent that these motions for a new trial are based upon the aforesaid papers of Assistant United States Attorney Shaw, decision is reserved pending a hearing on the voir dire, on notice to all counsel,[25] with respect thereto. In all other respects, the motions for a new trial should be, and they hereby are, denied, and it is

So ordered.

---

24. Except, of course, if any movant indicated a contrary intention.

25. On these motions Roy L. Reardon, Esq. and Allen Stim, Esq. represented movants

Charles Barcellona and Ralph Polizzano, respectively, as they did at the trial and on the appeal. The Court commends them for their services.